**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 28, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

In re: ALEXANDER N. KIM; LAURA J.
FOSTER,

    Debtors.

-----------------------------

ALEXANDER N. KIM; LAURA J.
FOSTER,

    Appellants,

v.

JP MORGAN CHASE BANK N.A.;
DOUGLAS E. LARSON, Chapter 7
Trustee,

    Appellees.

No. 18-1186
(D.C. No. 1:16-CV-02928-PAB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **MURPHY**, and **PHILLIPS**, Circuit Judges.
_____

Seeking a substantial windfall, Alexander Kim and Laura Foster, a married couple,

argue that JP Morgan Chase Bank cannot enforce a promissory note that Kim signed in

return for a $2,000,000 loan. Their lone reason: the original promissory note is nowhere

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

to be found. During Kim and Foster's bankruptcy proceedings, the bankruptcy judge

sided with Chase, concluding that Chase could enforce the promissory note, even though

the original is lost, because Chase had satisfied the elements of Colorado's lost-

instrument statute. Agreeing that Chase can enforce the promissory note under the lost-

instrument statute, we hold that Chase presented admissible evidence in the bankruptcy

proceedings to show that it constructively possessed the original promissory note when it

was lost, that it had the right to enforce the promissory note at that time, and that Chase

did not transfer the promissory note to its attorney. Accordingly, we affirm the

bankruptcy court's dismissal of Kim and Foster's objection to Chase's proof of claim.

## BACKGROUND

### I.      Events Leading to Kim and Foster's Bankruptcy and the Initial Bankruptcy Proceedings

On February 22, 2008, Kim obtained a $2,000,000 construction loan from

Washington Mutual Bank so that he and Foster could construct a 10,000 square-foot

building with an on-site commercial kitchen for their catering business in

Carbondale, Colorado. Kim signed a promissory note (Note), pledging to pay

$2,000,000 plus interest to Washington Mutual, and he and Foster executed a deed of

trust covering the business's property (except the water rights) to secure the Note.

Washington Mutual indorsed the Note in blank, meaning Washington Mutual's

2

indorsement did not identify a specific person "to whom it ma[de] the instrument payable." Colo. Rev. Stat. Ann. § 4-3-205(a)–(b) (West 2020).[1]

In 2008, in the midst of the housing-market crash that spurred the Great Recession, Washington Mutual failed, leading the Office of Thrift Supervision to shutter it. The Office of Thrift Supervision appointed the Federal Deposit Insurance Corporation (FDIC) as the receiver of Washington Mutual and its assets.

On September 25, 2008, Chase and the FDIC agreed to a Purchase and Assumption Agreement through which Chase would purchase "certain assets" that Washington Mutual held. App. vol. 3 at 745. Section 3.3 of the Purchase and Assumption Agreement requires that conveyances under the agreement "be made, as necessary, by receiver's deed or receiver's bill of sale." App. vol. 8 at 1968 (capitalization removed). Through the Purchase and Assumption Agreement, Chase alleges that it "purchased all of [Washington Mutual's] mortgage loans," including Kim's Note. Appellee Chase's Answer Br. 4 (citing App. vol. 10 at 2472–515; *id.* vol. 7 at 1813:4–15). Kim and Foster dispute whether Chase purchased the Note, asserting that no evidence shows that the FDIC ever executed a receiver's deed or a receiver's bill of sale.

---

[1] Though the first page of the Note shows that Kim (the borrower) promised to pay $2,000,000 to the order of "Lender" (Washington Mutual), the last page of the Note shows a stamp that says, "pay to the order of [blank] without recourse." App. vol. 10 at 2466 (some capitalization removed). Tobin Tange, Washington Mutual's Vice President, signed and indorsed the promissory Note. Thus, Washington Mutual, as the holder of the Note, indorsed the Note in blank, because it did not make the Note payable to an identified person. *See* Colo. Rev. Stat. Ann. § 4-3-205(a)–(b).

Whatever the case, Chase eventually sent Kim and Foster notice that it "was [now] the servicer" for the Note. App. vol. 3 at 745. Kim and Foster then began sending Chase checks that were made payable to Washington Mutual.

Like Washington Mutual, Kim and Foster began experiencing financial difficulties of their own, and on September 21, 2010, they filed for bankruptcy under Chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1101–1195 (2018). Around this time, they defaulted on the Note. On November 12, 2010, Chase filed in the bankruptcy case a proof of claim,[2] which Chase amended on February 27, 2013. The bankruptcy court then converted the bankruptcy into a Chapter 7 Bankruptcy, *see* 11 U.S.C. §§ 701–784 (2018), a conversion that Kim and Foster attribute to "numerous errors by [the] initial bankruptcy attorneys." Appellants' Opening Br. 8.[3]

---

[2] The Bankruptcy Code does not define the term "proof of claim," but Federal Rule of Bankruptcy Procedure 3001(a) states that it is "a written statement setting forth a creditor's claim."

[3] In a Chapter 7 bankruptcy, a bankruptcy trustee liquidates the property existing in the bankruptcy estate at the time of the bankruptcy to pay the debtor's creditors, and, in return, the bankruptcy court grants the debtor a discharge, which (among other things) "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor." 11 U.S.C. § 524(a)(2) (2018); *see also id.* §§ 726–727. Chapter 11, on the other hand, grants the debtor's business a chance at reorganization, and a bankruptcy "trustee may operate the debtor's business" during a Chapter 11 bankruptcy. *Id.* § 1108; *see also id.* § 1115(a)–(b) (including post-petition property in the bankruptcy estate and generally permitting debtors to "remain in possession of all property of the estate"). Presumably, the "errors" that Kim and Foster allude to is that by allowing the bankruptcy to be converted from a Chapter 11 bankruptcy into a Chapter 7 bankruptcy, Kim and Foster's earlier attorneys deprived them of the opportunity to maintain and manage their business while seeking to emerge from bankruptcy.

With new counsel in place, on March 5 and 12, 2014, Kim and Foster sent letters to Chase requesting to see the original Note. Chase did not immediately respond. Instead, on March 28, 2014, Chase filed a motion with the District Court of Eagle County, Colorado, seeking to foreclose under the deed of trust and sell Kim and Foster's property.

During the state-foreclosure proceedings, Kim and Foster served discovery requests on Chase, demanding that Chase produce the original Note. Chase opposed those discovery requests and filed a motion to strike discovery. At a second status conference, Chase admitted that as of June 10, 2014, it "was not currently in possession of the original [Washington Mutual] Note." App. vol. 3 at 746. Chase never produced the original Note at further state proceedings and eventually filed a motion to withdraw its earlier motion seeking foreclosure.

The case then returned to the bankruptcy court, where Kim and Foster filed a motion for examination under Federal Rule of Bankruptcy Procedure 2004. This motion allows an examination into "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b). Kim and Foster claimed a right to discharge Chase's claim, so they served subpoenas on Chase and sought production of the original Note.

On July 6, 2015, Chase produced thousands of document pages but did not provide the original Note. On July 30, 2015, the bankruptcy court entered an order setting the matter for a hearing and ordered Chase to bring the original Note. At the

5

hearing, Chase failed to produce the Note and admitted that it was not in possession of the original.

At the bankruptcy judge's invitation, Kim and Foster filed a motion for sanctions, and they also filed an objection to Chase's proof of claim. Chase opposed the objection, arguing that even though the Note was lost, Chase was still a holder entitled to enforce the Note. Before ruling on these matters, the bankruptcy court held a two-day evidentiary hearing.

## II.     Evidentiary Hearing

On June 21 and 22, 2016, the bankruptcy court heard the parties' evidence. The key witness was a "mortgage banking research officer," Marilyn Lea. App. vol. 7 at 1785:24–25.

### A.     Marilyn Lea

Lea testified that, as a mortgage-banking research officer, she "review[ed] loans that are in litigation." *Id.* at 1786:1–2. She explained that she had reviewed Chase's business records and that she had oftentimes testified in Chase's legal proceedings. Though she did not actively manage customer-service accounts, she was "very familiar with their processes and [had] been trained in [them]." *Id.* at 1786:8– 15. At the time of the hearing, Lea had been working for Chase for over seven years.

Lea testified that even though she was primarily involved with Chase's litigation matters, she had personally "create[d] a few" business records for them. *Id.* at 1787:25–1788:2. She stated that she would "pull summaries and reports out of the business records" and "make notations" in a computer system about "appearances

6

that are coming up." *Id.* at 1788:3–6. She also stated that she "review[ed] Chase's business records on an ongoing basis every day." *Id.* at 1793:10–14.

Lea admitted that Chase no longer possessed the original Note. She testified that Chase had sent the Note to its foreclosure counsel to commence foreclosure proceedings against Kim and Foster. Even though Chase usually would have required its counsel to sign and return a bailee's letter establishing that he was holding the original Note, Lea conceded that Chase had no such letter in its business records. She explained that Chase had not implemented its practice of requiring bailee's letters "until after this original note was sent out." *Id.* at 1789:2–3.

Kim and Foster's counsel then asked Lea about the Purchase and Assumption Agreement, specifically, whether Chase held in its business records the "receiver's deed or bill of sale" that the Purchase and Assumption Agreement required when the FDIC conveyed certain assets to Chase. *Id.* at 1790:4–19. She testified that such a deed or bill was not in Chase's system, although Chase did have the assignment of a deed of trust.

Lea knew little about the original Note: she had never handled it or spoken with Chase's foreclosure counsel about it. Nonetheless, through Lea, the bankruptcy judge admitted under Federal Rule of Evidence 803(6) numerous exhibits concerning the Note, with the following limiting instruction: "[They are] admitted as a business record contained in the records of Chase Bank and establish[] that and nothing further." *Id.* at 1832:25–1833:1.

7

## B.     Key Exhibits

After the two-day evidentiary hearing, the bankruptcy court issued a written order, which apparently rested on only Lea's testimony and two exhibits that the parties had introduced.[4] First, the court relied on Exhibit L and Lea's testimony about Exhibit L to determine that Chase had possessed the original Note in September 2009. Second, the court may have relied on Exhibit M and Lea's testimony about Exhibit M to find that Chase had lost the Note "sometime after the May 12, 2010 transmission of the original documents to Chase's prior attorney." App. vol. 5 at 1127 n.23.

### 1.     Exhibit L: Print-Out of a Screenshot of the Scanned Promissory Note

Exhibit L is a print-out of a screenshot of the Note's scanned first page. It contains computer data showing that it had been scanned into Chase's system on September 17, 2009. The computer data on the print-out shows that the owner was "WAMU" (Washington Mutual). The Note itself shows that the borrower (Kim) promised to pay the lender (Washington Mutual) $2,000,000, plus interest. Lea testified that the print-out proved "that the original note was deposited to Chase's vault or was scanned into Chase's vault" in September 2009. App. vol. 7 at 1827:1–1828:7.

---

[4] Though Kim and Foster challenge several other exhibits, they seem to concede that those other exhibits do not matter. *See* Appellants' Reply Br. 14 (noting that "the Court relied on a narrow and specified set of evidence" and citing Exhibit L, Exhibit M, and Lea's testimony). Because we conclude that the other exhibits are immaterial for our purposes, we need not consider their admissibility.

### 2. Exhibit M: "Doc-Line-Report"

Exhibit M is a summary report about the Note that identifies Washington Mutual as the "Heritage Indicator" and Kim as the borrower. App. vol. 10 at 2619. This report states that the "[p]roperty [s]tate" is Colorado, identifies the relevant County number for the property, and identifies Chase's foreclosure counsel under a track-location-description heading. *Id.* at 2619–20. It shows that the "doc[ument] release date" was May 12, 2010. *Id.* at 2622 (capitalization removed). It also states that "[t]he file is located at a Litigation or Bankruptcy attorney[']s office." *Id.* at 2623.

### C. Robert Byrnes

Also at the hearing, Kim and Foster introduced testimony from their expert, Robert Byrnes, stating that he could not verify whether Exhibit L was a true and accurate copy without reviewing the original scan of Exhibit L, not just a copy of the scan. Byrnes testified that the electronic copies he had examined had been created or modified in 2015. During Byrnes's brief cross-examination, when asked if he had "any opinion as to whether the PDFs accurately reflect Chase's computer-stored records," he said, "No, I do not." App. vol. 7 at 1782:17–20.

### D. The Bankruptcy Court's Order

In its order on Kim and Foster's claim objection, the bankruptcy court addressed two issues: (1) whether Chase was entitled to enforce the Note, and (2) whether and what sanctions were appropriate against Chase. The bankruptcy judge ultimately awarded Kim and Foster $22,841.03 in sanctions, and Chase does

9

not challenge that award on appeal. What is at issue, though, is the bankruptcy court's ruling that Chase was entitled to enforce the Note.

### 1. Standing

Before reaching its conclusion on the merits, the bankruptcy court first considered standing. It noted that Chapter 7 debtors "generally do[] not have such standing to bring objections to claims and other issues of administration of the bankruptcy estate, unless they can show after payment of creditors a surplus will remain to be paid to the debtor." App. vol. 5 at 1124 (citing *Cult Awareness Network, Inc. v. Martino* (*In re Cult Awareness Network, Inc.*), 151 F.3d 605, 608 (7th Cir. 1998)).

The bankruptcy court noted that the parties had presented no evidence about the solvency of the bankruptcy estate. On its own review, the bankruptcy court surmised that it was unlikely that the estate was solvent. Nonetheless, the bankruptcy court considered the case an unusual one: "the Debtors' contention they would like to negotiate with the proper party with respect to the Note and [deed of trust] creates a pecuniary interest in that if they are able to negotiate a payment plan, they will be able to retain their residence and operate their business from the property." *Id.* Thus, the bankruptcy court ruled that "in the present dispute only, the Court finds the Debtors have standing to proceed." *Id.*

### 2. Merits

After confirming that Kim and Foster had standing to object to Chase's proof of claim, the bankruptcy judge next considered whether Chase could enforce the

Note. The bankruptcy court isolated the issue to whether Chase has a right to payment—that is, a claim. That issue turns on state law, *Miller v. Deutsche Bank Nat'l Tr. Co.* (*In re Miller*), 666 F.3d 1255, 1262–63 (10th Cir. 2012) (quoting *In re Mims*, 438 B.R. 52, 56 (Bankr. S.D.N.Y. 2010)), so the bankruptcy court looked to Colorado's version of the Uniform Commercial Code (UCC). Agreeing that Washington Mutual indorsed the Note in blank by not indorsing it as payable to the order of an identified party, the court turned to whether Chase could enforce the Note even though it was lost. Relying on Colorado's lost-instrument statute, the bankruptcy court determined that Chase had to meet three elements to succeed: "1) Chase was in possession of the instrument and entitled to enforce it when loss of possession occurred; 2) the loss of possession was not the result of a transfer by Chase or a lawful seizure; and 3) Chase cannot reasonably obtain possession of the Note." App. vol. 5 at 1125–26 (quoting Colo. Rev. Stat. Ann. § 4-3-309(a)–(b)).

First, the bankruptcy court found that Chase had once possessed the Note because "Chase produced convincing evidence the Note was scanned into its business records." *Id.* at 1126. Relying on the scan date from Exhibit L (and Lea's testimony), the court found that Chase had scanned the original Note into its system on September 17, 2009.

The bankruptcy court also found Expert Byrnes's testimony unpersuasive. The court noted that Byrnes had claimed that he would have to examine the original scanned promissory Note to determine whether Exhibit L (the screenshot) was an identical match. But Byrnes had not shown or claimed that the scan of the original

11

Note had ever been altered, and the bankruptcy court credited Lea's testimony that she had no ability to change a scan that was in Chase's system. Finding Lea "credible," the Court stated that "Chase ha[d] provided an accurate copy of the original Note." *Id.* at 1127.

Second, the bankruptcy court noted that "neither party suggests . . . that Chase transferred the original Note to another entity, or that the Note was lawfully seized by another entity." *Id.* Also, the bankruptcy court concluded that the Purchase and Assumption Agreement—which requires that certain assignments between the FDIC and Chase be documented by a receiver's deed or bill of sale—was irrelevant to whether Chase had acquired the Note.

Third, the bankruptcy court found that "there is no question that [the] original paper Note was lost, possibly in transmission to or from Chase's prior counsel. Therefore, Chase cannot reasonably be expected to find and produce the original Note." *Id.* at 1128.

Having decided that Chase met all three elements of the lost-instrument statute, the court ruled that Chase had met its burden of showing that it was entitled to enforce the Note. Thus, it denied Kim and Foster's objection to Chase's proof of claim.

### E.    The District Court Affirms the Bankruptcy Court.

Kim and Foster appealed the bankruptcy court's ruling to the district court. The district court concluded that the bankruptcy court had relied on admissible evidence in concluding that Chase possessed the Note in 2009 and agreed that the

12

Purchase and Assumption Agreement was irrelevant to whether the FDIC had transferred the Note to Chase. In addition, the district court ruled that the evidence supported the bankruptcy court's conclusion that Chase had lost the Note, as opposed to having transferred the Note or having had it seized. After rejecting Kim and Foster's additional arguments, the district court affirmed the bankruptcy court on all grounds. Kim and Foster timely appeal, and we have appellate jurisdiction under 28 U.S.C. § 158(d)(1).

## DISCUSSION

### I. Opinion Under Review and Standard of Review

We independently review the bankruptcy court's order and afford no deference to the district court's intermediate ruling. *Aviva Life & Annuity Co. v. White* (*In re Millennium Multiple Emp'r Welfare Benefit Plan*), 772 F.3d 634, 638–39 (10th Cir. 2014) (citing *Miller v. Bill & Carolyn L.P.* (*In re Baldwin*), 593 F.3d 1155, 1159 (10th Cir. 2010); *In re Miller*, 666 F.3d at 1260)). We review de novo the bankruptcy court's legal conclusions but examine its factual findings for clear error. *Nelson v. Long* (*In re Long*), 843 F.3d 871, 873 (10th Cir. 2016). When reviewing the bankruptcy court's factual findings, we "must defer to facts found by the bankruptcy court unless '[they are] without factual support in the record' or, after examining all the evidence, we are left with a 'definite and firm conviction that a mistake has been made.'" *DSC Nat'l Props., LLC v. Johnson* (*In re Johnson*), 477 B.R. 156, 168 (B.A.P. 10th Cir. 2012) (citations omitted). Yet if the bankruptcy court's factual findings "are premised on improper legal standards or on proper ones improperly

13

applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review." *Sender v. Johnson* (*In re Hedged-Invs. Assocs., Inc.*), 84 F.3d 1267, 1268 (10th Cir. 1996) (internal quotation marks and citation omitted).

A bankruptcy court's evidentiary rulings to admit evidence—as opposed to its factual findings—are generally reviewed for abuse of discretion. *See United States v. Collins*, 575 F.3d 1069, 1073 (10th Cir. 2009) (citing *United States v. Chavez*, 229 F.3d 946, 950 (10th Cir. 2000)). But because Kim and Foster challenge hearsay rulings, they have a particularly heavy burden. *See United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005) ("[H]earsay determinations are particularly fact and case specific, [so] our review of those decisions is 'especially deferential.'" (quoting *Chavez*, 229 F.3d at 950; and citing *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004))). Moreover, Kim and Foster's hearsay challenges rely on the Federal Rules of Evidence; thus, the harmless-error standard applies, and we will reverse only if we have a "grave doubt as to whether" any errors had "a substantial influence on the outcome." *See Collins*, 575 F.3d at 1073 (internal quotation marks omitted) (quoting *United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995)).

## II.    The Lost-Instrument Statute

A creditor has a "claim" to property in the bankruptcy estate if it has a "right to payment." 11 U.S.C. § 101(5)(A) (2018). State law determines the extent to which a creditor has property rights to assets within the bankruptcy estate. *In re Miller*, 666 F.3d at 1262 (citation omitted). So, like in *In re Miller*, "[w]e must . . . turn to Colorado law, in particular [Colorado's] version of the [UCC]." *Id.* at 1262–63.

14

Under Colorado law, a promissory note is "payable to bearer if it . . . [d]oes not state a payee." Colo. Rev. Stat. Ann. § 4-3-109(a)(2) (West 2020). As discussed, Washington Mutual did not make the Note payable to any payee, so the Note is payable to bearer.

Generally, the only people entitled to enforce a blank-indorsed note are those in physical possession of it. That is because Colorado law states that "[w]hen indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed." *Id.* § 4-3-205(b); *see also In re Miller*, 666 F.3d at 1263–64 ("In the case of bearer paper . . . physical possession is essential because it constitutes proof of ownership and a consequent right to payment.").

Colorado's lost-instrument statute is an exception to this general rule. In pertinent part, the lost-instrument statute states:

> A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

Colo. Rev. Stat. Ann. § 4-3-309(a) (West 2020). So even if a holder of a note lost it, he or she may enforce the note by satisfying these three elements. The question now is whether the bankruptcy court was correct in ruling that Chase had satisfied all three of the lost-instrument statute's elements. Arguing that it was not, Kim and

Foster first claim that the court relied on inadmissible evidence, meaning that no factual basis existed for concluding that Chase had met these elements. Second, Kim and Foster assert that Chase did not meet these elements as a matter of law.

## III.    Kim and Foster's Factual Arguments

### A.    Lea's Direct-Examination Testimony

Kim and Foster argue that the bankruptcy court erred by relying on Lea's testimony because "she had no personal knowledge concerning Chase obtaining possession of the original Note in 2009, Chase sending the Note to [its foreclosure counsel] in 2010, or not receiving the Note back." Appellants' Opening Br. 43. And Kim and Foster contend that without personal knowledge, she could not provide relevant evidence concerning Chase's possession and loss of possession of the Note. In addition, Kim and Foster argue Lea's testimony about Exhibits L and M (and their contents) is inadmissible, because she was merely "'parroting' the content of the Exhibits." Appellants' Reply Br. 21 (quoting *United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015)).

But Kim and Foster's counsel called Lea to testify on direct examination as an adverse witness. And "[g]enerally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755 (2000) (citation omitted). Discussing *Ohler*, we have stated that "the party introducing the evidence waives—rather than forfeits—any objection to its admission, meaning 'we do not consider the claim at all, even under the forgiving plain-error standard.'" *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d

16

1251, 1258 (10th Cir. 2016) (quoting *Hancock v. Trammell*, 798 F.3d 1002, 1011 n.3 (10th Cir. 2015)).[5] This waiver rule applies in civil cases, *id.* at 1258 n.5 (citations omitted), and it applies when a party elicits testimony on direct examination, *see id.* at 1258 (applying *Ohler* when a party elicited testimony on direct examination).

This waiver is significant because Lea's direct-examination testimony establishes all three elements of the lost-instrument statute. When asked if she had spoken with anyone at Chase who knew which (if any) Chase employees "physically took possession of the note," Lea testified that she knew "that the vault personnel [at Chase's vault in Monroe, Louisiana,] physically took possession of the note." App. vol. 7 at 1800:15–20. Further, when asked if "Chase [wa]s not in possession of the original Alexander Kim note," Lea responded, "[c]orrect." *Id.* at 1788:10–12. Lea then stated that Chase had sent the original Note to its foreclosure counsel and that Chase still, as of June 2016, had the right to enforce the Note.

Starting with element one—"the person was in possession of the instrument and entitled to enforce it when loss of possession occurred"—we find that Lea's testimony directly states that Chase physically possessed the Note. And because Kim and Foster agree that "physical possession" of a blank-indorsed note "constitutes proof of ownership and a consequent right to payment," Appellants' Opening Brief

---

[5] As it affects Lea's direct-examination testimony, Kim and Foster's fallback argument—"that if each objection was not clearly preserved, there is no waiver of the issue if there is plain-error resulting in manifest injustice"—is therefore precluded by *Vehicle Market Research*. Appellants' Reply Br. 13 (alteration, internal quotation marks, and citation omitted).

17

at 32 (citing *Miller*, 666 F.3d at 1262–63), her testimony also establishes that Chase had the right to enforce the Note.

All that leaves for element one is timing: Chase must show it possessed and could enforce the Note "when loss of possession occurred." But the bankruptcy court found that "[t]he original Note was removed from the vault and transferred to Chase's prior attorney, and was thereafter lost and has not been returned," a finding that establishes Chase both possessed the Note and could enforce it when it was lost. App. vol. 5 at 1126. And Lea's testimony on direct examination supports that finding. She stated that Chase sent the Note to its foreclosure counsel and that the Note was lost thereafter. From this testimony, even if Lea did not provide a precise date, we conclude that the bankruptcy judge drew a reasonable inference that Chase maintained possession (and, therefore, the right to enforce the Note) when the Note was lost. *See United States v. Porter*, 928 F.3d 947, 962 (10th Cir. 2019) ("Under clear error review, we 'view the evidence and inferences drawn therefrom in the light most favorable to the [bankruptcy] court's determination.'" (quoting *United States v. Brown*, 314 F.3d 1216, 1222 (10th Cir. 2003))).[6]

Next, for element two, Chase must prove that it did not lose possession through a transfer or a lawful seizure. Colo. Rev. Stat. Ann. § 4-3-309(a). Finding for Chase again, the bankruptcy court stated that "[n]o evidence indicates, and, indeed, neither party suggests, that Chase transferred the original Note to another entity, or

---

[6] Our conclusion that Chase maintained constructive possession also supports this finding. *See* discussion *infra* Section IV.A.

18

that the Note was lawfully seized by another entity." App. vol. 5 at 1127. In a footnote, the bankruptcy court reasoned that Chase entrusted the Note with its attorney so that he could hold it as Chase's agent.

Lea's testimony on direct examination also supports that finding. Again, she testified that Chase sent the Note to its foreclosure counsel and that, at the time of the hearing (June 2016), Chase still had the right to enforce the Note. But if Chase maintained the right to enforce the Note in 2016, then the bankruptcy court could have easily inferred that Chase never transferred the Note to its attorney or gave up its right of possession. Rather, Chase still possessed the Note then, and the attorney merely took custody over it through an agency relationship.[7]

Likewise, Lea's testimony supports the bankruptcy court's finding on element three: "there is no question that [the] original paper Note was lost, possibly in transmission to or from Chase's prior counsel. Therefore, Chase cannot reasonably be expected to find and produce the original Note." App. vol. 5 at 1128. As mentioned, Lea testified on direct examination that Chase possessed the Note, sent the Note to its foreclosure counsel, and that the Note was then lost. From this testimony, we conclude that the bankruptcy court could have reasonably inferred that Chase could not obtain the Note, because its whereabouts could not be determined.[8]

---

[7] Again, our later conclusion that Chase maintained constructive possession of the Note through an agency relationship precludes any contrary argument. *See* discussion *infra* Section IV.A.

[8] In addition to Lea's testimony, the bankruptcy court could have drawn this inference from evidence that was *not* before the court. If Chase knew about the

19

Kim and Foster introduced this testimony themselves; therefore, under *Ohler*, they cannot now challenge the admissibility of this evidence on appeal. And because "we may affirm on any ground supported by the record," *Johnson v. Spencer*, 950 F.3d 680, 720 (10th Cir. 2020) (citation omitted), we could stop our analysis here and conclude that through Lea's testimony, Kim and Foster satisfied Chase's burden for Chase.[9]

## B. Lea's Cross-Examination Testimony About Exhibit L

Even assuming Lea's direct-examination testimony was not enough, her cross-examination testimony about Exhibit L definitively resolves the primary dispute—whether Chase possessed the Note. On cross-examination, Lea testified about the contents of Exhibit L (a print-out of a screenshot of the Note's scanned first

---

blank-indorsed Note's whereabouts, it seems a fair inference that Chase would have produced the Note, rectifying the problems—one being the possibility of sanctions—that it had created by having lost the Note. And if Chase never actually possessed the Note and some other unidentified entity did (as Kim and Foster seem to suggest), then the bankruptcy judge could have reasonably questioned why that entity never filed a proof of claim in the bankruptcy proceedings, seeking to recover what it could on the $2,000,000 debt instrument.

[9] Kim and Foster argue that the bankruptcy judge violated the law of the case by exceeding the limiting instructions that it attached to Chase's business records. But Kim and Foster forfeited their law-of-the-case argument by not raising it in the original appeal to the district court. *See Foster v. Hill* (*In re Foster*), 188 F.3d 1259, 1264 n.5 (10th Cir. 1999) (holding that a party had "forfeited the issue in [that] appeal" by not raising it on appeal to the "district court as an alternative basis to affirm"). And even if Kim and Foster had not forfeited it, we would refuse to consider it, because we can affirm the bankruptcy court's decision that Chase satisfied the elements of the lost-instrument statute based on this direct-examination testimony alone. *See Johnson*, 950 F.3d at 720.

20

page) and the procedures Chase followed when scanning notes. Among other things, she explained that

- Chase contemporaneously scanned notes into its system when it received the original notes, and Chase had no ability to change scan dates.
- On September 17, 2009, Chase scanned the original Note into its computer system.
- Therefore, on September 17, 2009, Chase had possession of the original Note.

We conclude that this testimony, if admissible, provided a factual basis for the bankruptcy court to find that Chase had obtained possession of (and, thus, the right to enforce) the Note. As they did in the bankruptcy court, Kim and Foster argue that this evidence should never have been introduced because it is inadmissible.[10]

Hearsay evidence is "an oral or written assertion by a declarant offered to prove the truth of the matter asserted." *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018) (citing Fed. R. Evid. 801). Such evidence is generally inadmissible.

---

[10] Chase claims that "[a]t the Evidentiary Hearing, Debtors' counsel never objected to the admissibility of Ms. Lea's testimony on the basis of a lack of first-hand knowledge or any other grounds," meaning we should now apply our demanding plain-error standard of review to the business-record-exception issue. *See* Appellee Chase's Answer Br. 25. But the record shows that when Chase moved to admit Exhibit L, lack of personal knowledge was one of many objections Kim and Foster raised:

> MS. LOWERY-GRABER: Your Honor, I'd ask for admission of Exhibit L.
> MR. BUECHLER: Objection, Your Honor, foundation, best evidence, double hearsay after triple hearsay, Your Honor and *lack of personal knowledge*.

App. vol. 7 at 1832:18–22 (emphasis added). Because Kim and Foster objected to this evidence in the bankruptcy court, we do not apply plain-error review.

Fed. R. Evid. 802. As an exception to the rule against hearsay, business records are admissible to prove the truth of the matters asserted within those records if the party offering the business record can satisfy these elements:

> [B]usiness records are admissible despite their hearsay nature if the records' custodian, or another qualified witness, testifies the records (1) were prepared in the normal course of business; (2) were made at or near the time of the events recorded; (3) were based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) are not otherwise untrustworthy.

*United States v. Irvin*, 682 F.3d 1254, 1261 (10th Cir. 2012) (citing *United States v. Ary*, 518 F.3d 775, 786 (10th Cir. 2008)); *see also* Fed. R. Evid. 803(6). For the following reasons, we hold that Chase has satisfied each of these elements.

### 1. Lea was a qualified witness.

Kim and Foster argue that Lea was incompetent to testify about whether Chase obtained possession of the Note. Among other things, they argue that she lacked first-hand knowledge about any of the details surrounding the Note and that she did not learn of those details from people who would have scanned the Note into Chase's system.

Federal Rule of Evidence 803(6)(D) requires testimony from the custodian of the business record or "another qualified witness." The rule does not define the term "another qualified witness," but most courts have "broadly interpreted [it] to require only that the witness understand the record-keeping system." *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990) (citations omitted); *see also Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) ("[W]e have established that the

22

'custodian or other qualified witness need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information.'" (citations omitted)); *Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir. 1985) ("A qualified witness is simply one who can explain and be cross-examined concerning the manner in which the records are made and kept." (citation omitted)).

Here, Lea's testimony demonstrated that she thoroughly understood Chase's recordkeeping process. She testified that she reviewed Chase's business records daily. She testified that she herself had created business records for Chase. She knew about where Chase maintained its document vault—Monroe, Louisiana—and she testified that she had inspected the vault herself. She testified that "the vault records are kept very meticulously." App. vol. 7 at 1800:23. She testified that she "personally witnessed how [Chase employees] scan in the documents and separate the files." *Id.* at 1801:15–22. She explained how Chase's I-Vault system—where Chase electronically stored its records after they were scanned—functioned. She described which Chase personnel were authorized to enter information into the I-Vault system. She explained that, temporally, Chase employees scanned documents as they were received and immediately uploaded into the I-Vault system. Finally, she explained that she had acquired this knowledge after having served as a Chase mortgage-banking research officer for over seven years.

Thus, we conclude that Lea was a qualified witness. As a result, contrary to Kim and Foster's argument, Lea did not need to have personal knowledge about Exhibit L's contents to testify about Exhibit L.

**2.      Exhibit L was prepared in the normal course of business.**

When asked if Exhibit L was "kept and maintained in the ordinary course of its business," Lea testified, "[y]es." *Id.* at 1831:16–18. Even so, Kim and Foster argue that Exhibit L was not maintained in the ordinary course of business, because it is a print-out of data that was stored in Chase's recordkeeping system and Chase created the document in preparation for this litigation. Specifically, Kim and Foster assert that "[p]reparing a document for litigation is not the regular course of business, preventing trustworthiness." Appellants' Reply. Br. 16 (citations omitted).

But our circuit rejected that argument thirty years ago: "so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice, the fact that the hard copy offered as evidence was printed for purposes of litigation does not affect its admissibility." *United States v. Hernandez*, 913 F.2d 1506, 1512–13 (10th Cir. 1990); *see also Channon*, 881 F.3d at 811 ("As we have previously held, business records in one form may be presented in another for trial." (citing *Hernandez*, 913 F.2d at 1512–13)). The original electronic scan is what matters here, and just because Chase presented that business record in a different form does not make it inadmissible if the other elements of the business-record exception are satisfied.

### 3. The original scan was made near the time of the events at issue.

Lea testified that Exhibit L's scan date was entered in both a timely and trustworthy fashion. She testified that the original Note was scanned on September 17, 2009. She also testified that the records were kept "very meticulously" and that the "scan date cannot be changed." App. vol. 7 at 1800:23, 1803:21–22.

Kim and Foster's only argument to the contrary is based on Expert Byrnes's testimony that because he had not reviewed the original scanned file, he could not confirm that Chase scanned the document into its system in 2009 or created the original scan at that time. Byrnes testified that the electronic copies he had received had been created or modified in 2015. Thus, Byrnes testified that he did not have "any opinion as to whether the PDF[] accurately reflect[ed] Chase's computer-stored records." *Id.* at 1782:17–20.

Relying on Lea's testimony, the bankruptcy judge chose to credit her account over Byrnes's hesitancies about Exhibit L. He noted that Byrnes had not claimed that "the scan of the original Note had been fraudulently altered." App. vol. 5 at 1127. And he noted that Lea had testified that "when she creates an image of a scanned document from Chase's electronic files, she has no ability to change any of the scan information." *Id.*

Kim and Foster's argument that Exhibit L is unreliable because it was created "in 2015, not contemporaneously with events allegedly occurring in 2009-2011," Appellants' Reply Br. 17, asks us to make a credibility determination—crediting Byrnes's concerns about his inability to verify that the original scan was created in 2009 over Lea's

25

testimony that the original scan must have been made in 2009 because the scan date could not be changed and was contemporaneously generated as it was inputted into Chase's system. But on a clearly erroneous standard of review, we leave that credibility determination for the bankruptcy judge. *See Mason v. Young* (*In re Young*), 237 F.3d 1168, 1176 (10th Cir. 2001) ("However, that is a credibility determination that is properly the province of the trier of fact—in this case the bankruptcy court—, and we may not disturb that trier of fact's credibility determinations on appeal." (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985))). In *Anderson*, the Court instructed that "the court of appeals may not reverse [a district court] even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." 470 U.S. at 574 (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)). Lea's account was permissible—indeed, it was more persuasive— hence we conclude that the bankruptcy court did not clearly err by concluding that the original scan was created at or near the time of the 2009 events at issue. And because Exhibit L is just a print-out of a screenshot of the scanned Note, it is admissible. *See* 2 Kenneth S. Broun et al., McCormick On Evidence § 294 (Robert P. Mosteller ed., 8th Fed. Jan. 2020 update) ("The question as to the timeliness of the creation of the record is answered by observing that the time requirement refers to when the entry into the data bank was originally made, not the time the printout was produced." (collecting cases)).

**4. Exhibit L was based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant.**

Kim and Foster do not address whether the vault personnel who entered into Chase's system the information contained in Exhibit L had personal knowledge of the information or a business duty to transmit the information. But Lea did: she testified that "I-Vault personnel" at Chase's Monroe, Louisiana vault contemporaneously entered information as they were scanning the document into Chase's system. App. vol. 7 at 1829:6–25. She also testified that once the scan date was entered, "that scan date cannot be changed." *Id.* at 1803:21–22. Accordingly, we conclude that Exhibit L was based on the personal knowledge of a Chase employee who was working in the Monroe, Louisiana vault and who contemporaneously entered the information as it was scanned.

**5. Exhibit L was created through and from trustworthy methods, sources, and circumstances.**

Because Exhibit L meets the four elements just discussed, it is admissible under the business-record exception unless Kim and Foster "show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). Kim and Foster's burden is heavy, because "bank records are particularly suitable for admission under Rule 803(6) in light of the fastidious nature of record keeping in financial institutions, which is often required by governmental regulation." *United States v. Johnson*, 971 F.2d 562, 571 (10th Cir. 1992).

Attempting to satisfy that heavy burden, Kim and Foster retrace arguments that we have already rejected. They reassert that Exhibit L is inadmissible because it contains "multiple hearsay,"[11] that the print-out was "prepared in 2015" rather than in 2009 when the Note was originally scanned, that "Ms. Lea admitted [it was] prepared to defend this legal dispute," and that Lea did not count as a "qualified witness." Appellants' Opening Br. 39. We need not reconsider these arguments.

## C.     Summary

Lea's direct-examination testimony establishes that Chase has satisfied all three elements of the lost-instrument statute. Because Kim and Foster elicited this testimony themselves, they have waived any appellate challenge to the admissibility of Lea's direct-examination testimony.

And even if this evidence were not enough, Lea's cross-examination testimony about Exhibit L, an admissible business record, resolves the central dispute: whether

---

[11] Kim and Foster assert that Exhibit L contains "multiple hearsay" because "unidentified Chase employees" imputed the "underlying information" into Exhibit L. Appellants' Opening Br. 39. But "[d]ouble hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991). We have noted that "[i]f the source of the information is an outsider . . . Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have." *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 729 n.5 (10th Cir. 1993) (omission in original) (internal quotation marks omitted) (quoting *Wilson*, 939 F.2d at 271). Here, we have already concluded that Exhibit L was created in the regular course of business, and no evidence shows that an outsider conveyed Exhibit L's information—when Chase's vault personnel scanned the Note—to Chase's vault personnel.

Chase ever possessed the original Note. Her testimony on that issue shows that Chase scanned the Note into its electronic system in September 2009. This testimony thus proves that Chase had possession of the Note and the right to enforce it.

Accordingly, we conclude that the bankruptcy court relied on admissible evidence and that its factual findings were not clearly erroneous. We have no "grave doubt as to whether" the bankruptcy judge made an incorrect evidentiary ruling that had "a substantial influence on the outcome." *Collins*, 575 F.3d at 1073 (internal quotation marks and citation omitted). Next, we turn to Kim and Foster's arguments addressing whether, as a matter of law, Chase satisfied the elements of the lost-instrument statute.[12]

## IV.    Kim and Foster's Legal Arguments

Aside from their factual arguments, Kim and Foster raise two legal challenges to the bankruptcy judge's ruling. First, they argue in the alternative that even if Chase

---

[12] Kim and Foster also mount evidentiary challenges to Exhibit M. While we do have concerns about Exhibit M—namely, whether it was created in the ordinary course of business and near the time of the events at issue—we need not reengage in this analysis separately for Exhibit M. A review of the bankruptcy judge's order shows that if the bankruptcy judge even relied on Exhibit M, it was for one fact only: "Presumably th[e] loss [of the Note] occurred sometime after the May 12, 2010 transmission of the original documents to Chase's prior attorney, but no precise date was identified." App. vol. 5 at 1127 n.23. But the bankruptcy judge only *presumed* that Chase sent the Note to its foreclosure attorney on that day, explaining that the parties had not conclusively established a precise date when Chase would have done so. Nothing about that is in error, because the lost-instrument statute does not require precise dates. Lea's testimony establishes that Chase sent the Note to its foreclosure counsel some time after first receiving the Note from Washington Mutual in 2009. On a clearly erroneous standard of review, we conclude that this was all that was needed for the bankruptcy judge to make this finding.

possessed the Note, it transferred the Note to its foreclosure counsel when it sent the Note to him. Second, they argue that the FDIC's failure to follow the terms of the Purchase and Assumption Agreement meant that Chase never legally acquired the Note. We review de novo these two questions of law. *See In re Long*, 843 F.3d at 873.

### A. Chase Did Not Transfer the Note to Its Foreclosure Counsel.

Relying on *La Junta State Bank v. Travis*, 727 P.2d 48 (Colo. 1986), Kim and Foster argue that when Chase gave the blank-indorsed Note to its attorney, it transferred the Note to him. That is significant, Kim and Foster argue, because under the lost-instrument statute, a person who lost an instrument can enforce it only if "the loss of possession was *not* the result of a transfer." Colo. Rev. Stat. Ann. § 4-3-309(a) (emphasis added). Before addressing *La Junta State Bank*, we will first explain what constitutes a transfer.

### 1. Transfer

Under Colorado law, "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Colo. Rev. Stat. Ann. § 4-3-203(a) (West 2020). The plain language of this statute provides that a transfer occurs if two elements are satisfied: (1) a person who did not issue the instrument delivers it to another person, and (2) the person who delivers the instrument does so to give the person receiving delivery the right to enforce the instrument. Addressing this second element, the official commentary to this statute obligates courts to consider why the instrument

30

changed possession: "Subsection (a) defines transfer by limiting it to cases in which possession of the instrument is delivered for the purpose of giving to the person receiving delivery the right to enforce the instrument." *Id.* § 4-3-203 cmt. 1. Both delivery and intent matter, hence a transfer does not occur in "cases in which a delivery of possession is for some purpose other than transfer of the right to enforce." *Id.*

Here, no evidence shows that Chase gave the Note to its foreclosure counsel with the intent of giving him the right to enforce it on his own behalf. But that does not matter, Kim and Foster argue, because they claim that this transfer rule and Chase's intent are irrelevant, given that bearer paper has unique footing under Colorado law. They point out that a blank-indorsed instrument "may be negotiated by transfer of possession alone." Appellants' Reply Br. 3 (internal quotation marks omitted) (quoting Colo. Rev. Stat. Ann. § 4-3-205(b)). And because "[n]egotiation is merely a special form of transfer," *Pierce v. DeZeeuw*, 824 P.2d 97, 99 (Colo. App. 1991),[13] the next issue is how these principles operate in the context of a blank-indorsed note.

---

[13] "Negotiation" allows a person to become a "holder," a status that in turn allows a person to become a "holder in due course," an extra-special status that permits the party to "take the instrument free from all claims to it and most defenses of any party to the instrument." *La Junta State Bank*, 727 P.2d at 51 (citations omitted); *see also* Colo. Rev. Stat. Ann. §§ 4-1-201(20) (holder), 4-3-201(a) (negotiation), 4-3-302(a) (holder-in-due-course) (West 2020).

### 2. *La Junta State Bank* is distinguishable.

In *La Junta State Bank*, a woman named Katherine Warnock bought a $53,541.93 cashier's check from Pueblo Bank and Trust Company. 727 P.2d at 50. She indorsed "Katherine Warnock" on the back of the check and then gave it to her attorney, Jerry Quick. *Id.* Attorney Quick wrote "deposit only" under her indorsement and deposited the check in a separate trust account that he maintained at the La Junta State Bank. *See id.* The La Junta State Bank "collected the amount of the check from the Pueblo Bank and Trust Company." *Id.*

When Warnock died, one of the administrators of her estate could find no receipt for the cashier's check and discovered that the funds had not been remitted to the estate. *See id*. The administrator made a demand for payment on the La Junta State Bank, but it refused the demand because Attorney Quick's trust fund was depleted. *Id.* The administrators of the estate sued the La Junta State Bank on various state-law grounds, arguing that Attorney Quick had placed the words "deposit only" for Warnock's benefit; thus, they contended that the La Junta State Bank had a duty to set the funds aside in a separate account for her benefit rather than placing them in Attorney Quick's account. *Id.*

The Colorado Supreme Court reasoned that when Warnock bought the original cashier's check, "it was negotiable order paper in her hands." *Id.* at 52. This means that the cashier's check was payable "to any person that [she] designate[d]." *Paper*, Black's Law Dictionary (11th ed. 2019). By writing her name on the back of the check and not identifying a specific payee, the court concluded that she had indorsed

32

the check in blank. *La Junta State Bank*, 727 P.2d at 52; *see also* Colo. Rev. Stat. Ann. § 4-3-205 cmt. 2 ("A blank indorsement is usually the signature of the indorser on the back of the instrument without other words.").

The court then ruled that when Warnock delivered that blank-indorsed check to Attorney Quick, he "became a holder of the instrument in bearer form with the right to transfer or negotiate it by delivery alone." *La Junta State Bank*, 727 P.2d at 52. And because Attorney Quick received the cashier's check with a blank indorsement, "he was free to direct its deposit in any manner he elected." *Id.* at 55. Thus, when he wrote, "deposit only," that restrictive indorsement was "added by Quick on his own behalf." *Id.* As a result, the La Junta State Bank owed *Attorney Quick* a duty "to honor his restrictive indorsement," and it owed Warnock no duty at all. *Id.*

Significantly, the Colorado Supreme Court rejected the administrators' argument that Attorney Quick wrote for "deposit only" on Warnock's behalf as her agent. *Id.* at 53. Though agents can indorse a negotiable instrument for a principal, the court refused to infer that Attorney Quick was Warnock's agent; it stated that "the respondents presented no evidence that Quick wrote 'deposit only' on behalf of Warnock." *Id.* The court also remarked that no evidence had been presented showing "why Warnock purchased the check or how Quick acquired it." *Id.*

We view the Colorado Supreme Court's inquiry into that matter—how and why the attorney acquired the Note—as having significant implications. Consider a hypothetical in which Attorney Quick had been assisting Warnock with purchasing

33

real estate, and evidence showed that Warnock had given to him the cashier's check to present to the sellers at closing. Even if the check were bearer paper, would the Colorado Supreme Court have concluded that Warnock transferred the Note to Attorney Quick? In light of the doctrine of constructive possession, we think not.

Unlike actual possession, constructive possession exists if a person "has the power and intent to exercise control over the object," lack of physical control notwithstanding. *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015) (citing Black's Law Dictionary 1047 (5th ed. 1979); 2A K. O'Malley, J. Grenig & W. Lee, Federal Jury Practice and Instructions, Criminal § 39.12, p. 55 (6th ed. 2009)). Since deciding *La Junta State Bank*, the Colorado Supreme Court has recognized that constructive possession applies in the negotiable-instruments context. *See Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1214 (Colo. 2008) ("[T]here are circumstances wherein requiring actual physical possession of the instrument would be problematic and constructive possession applies." (citing 6 William D. Hawkland & Lary Lawrence, Uniform Commercial Code Series, § 3-301:3 (1999))). And though a blank-indorsed instrument was not at issue in *Georg*, the court there provided a rule for analyzing whether a party maintained possession of an instrument through constructive possession: "a determination of constructive possession should occur only when delivery is clearly for an identifiable person under circumstances excluding any other party as a holder in due course." *Id.* (citing Hawkland & Lawrence, *supra*, § 3-301:3). Because *La Junta State Bank* considered why Warnock gave Attorney Quick the blank-indorsed cashier's check and *Georg* applied

34

constructive possession in the negotiable-instruments context, this guidance from the Colorado Supreme Court shows that constructive possession is relevant in the negotiable-instruments setting—even in the case of bearer paper.[14]

Thus, we apply *Georg* here, meaning "a determination of constructive possession should occur only when delivery is clearly for an identifiable person under circumstances excluding any other party as a holder in due course." 178 P.3d at 1214 (citation omitted). Delivery occurs if a party (1) transfers possession of an instrument to another party (2) with intent to transfer possession. *Id.* at 1215. We have already concluded that at one time Chase had actual possession of the Note. And the FDIC's execution with Chase of the Purchase and Assumption Agreement, through which the FDIC transferred Washington Mutual's assets to Chase, satisfies

---

[14] And even if this guidance did not settle the issue, we would reach this result if we had to make an *Erie*–guess. *See Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007) ("Under our own federal jurisprudence, we will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves." (citations omitted)). This is the reasonably clear and principled course under Colorado law and, although the case law on the issue is sparse, appears to follow the general trend. *See, e.g.*, *Deutsche Bank Nat'l Tr. v. Moynihan*, 270 F. Supp. 3d 497, 508, 512 (D. Mass. 2017) (concluding that Massachusetts's lost-instrument statute does "not displace principles of agency," even in the context of a blank-indorsed note, and allowing a bank to enforce the note through constructive possession after its attorney-agent lost the note); *Lakiesha v. Bank of N.Y. Mellon*, No. 3:15-CV-0901-B, 2015 WL 5934439, at *10 (N.D. Tex. Oct. 9, 2015) ("[A] blank-indorsed promissory note is enforceable by the party to whose possession—constructive or actual—it is delivered." (citation omitted)); *Caraccia v. U.S. Bank, Nat. Ass'n*, 185 So. 3d 1277, 1279 (Fla. Dist. Ct. App. 2016) ("We emphasize that we do not hold that possession is not necessary when bearer paper is at issue; instead we hold only that, when an agency relationship such as that exists here is at issue, the element of possession can be met through either actual or constructive possession.").

the intent element. Thus, the FDIC's delivery of the Note was "clearly for an identifiable person"—Chase.

That brings us to the key issue: under these circumstances, did Chase transfer possession of the Note to its foreclosure counsel so that he became a holder-in-due-course? A holder of an instrument is "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." Colo. Rev. Stat. Ann. § 4-1-201(20)(A) (West 2020). And to be a holder-in-due-course, Chase's foreclosure counsel must "(1) be a holder; (2) of a negotiable instrument who took it; (3) for value; (4) in good faith; (5) without notice of certain problems with the instrument." *Georg*, 178 P.3d at 1212–13 (footnotes and citation omitted).

"Negotiation," a special form of transfer, determines whether a person can meet the first element and become a holder. *See* Colo. Rev. Stat. Ann. § 4-3-201(a) (West 2020). Section 201(a) defines "negotiation" as "a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person *who thereby becomes its holder*." (emphasis added). A party becomes a holder of an instrument through negotiation if that party also possesses the Note and it is blank-indorsed. *Id.* § 4-1-201(20)(A); *see also id.* § 4-3-205(b) ("When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer

of possession alone until specially indorsed."). Accordingly, Chase's foreclosure counsel's status hinges on whether Chase transferred possession of the Note to him.[15]

But Chase never transferred possession. As discussed, Lea testified that Chase gave custody of the Note to its foreclosure counsel, an action meant to facilitate foreclosure proceedings against Kim and Foster. That means that Chase gave its foreclosure counsel custody of the Note through an agency relationship—i.e., an attorney-client relationship. *See Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998) (explaining that the "traditional understanding of the attorney-client relationship" is that the attorney is the client's agent (citing Restatement (Second) of Agency § 1(3) cmt. e (Am. Law. Inst. 1957))). But as the Colorado Supreme Court recognized in *Georg*, "[u]nder traditional analysis, the agent's possession would be the owner's possession and thus the owner would have 'possession.'" 178 P.3d at 1213–14 (emphasis and citation omitted); *see also* 73 C.J.S. Property § 54 (Mar. 2020 update) ("Property in the hands of an agent or servant is in the possession and control of the principal or employer, *the agent or servant having only custody*, since the possession of the agent or servant is the possession of the principal or employer." (emphasis added) (footnote omitted) (collecting cases)); *cf. Holland v. Sutherland*,

---

[15] Kim and Foster also argue that the bankruptcy judge improperly shifted the burden from Chase (of proving that the Note was not transferred to its foreclosure counsel) to Kim and Foster (of proving that the Note was transferred). But the court did no such thing; it concluded that "[n]o evidence indicates, and, indeed, neither party suggests, that Chase transferred the original Note to another entity, or that the Note was lawfully seized by another entity." App. vol. 5 at 1127. This quote shows that the court relied on the "evidence" that the parties—*both* parties—provided to it.

635 P.2d 926, 928 (Colo. App. 1981) (concluding that an absent squatter can establish adverse-possession rights to real property through an agent's possession of the property, because the agent's possession is the principal's possession). So through this agency relationship, Chase's foreclosure counsel's physical custody of the Note *was* Chase's constructive possession. Therefore, because Chase maintained possession, it never transferred its possession of the Note to its foreclosure counsel, meaning it did not negotiate or transfer the Note.[16]

Claiming that physical custody is pivotal, Kim and Foster point out that even a thief who steals a blank-indorsed note becomes the holder of the note. *See* Colo. Rev. Stat. Ann. § 4-3-203 cmt. 1. That same comment recognizes that "[t]he right to enforce an instrument and ownership of the instrument are two different concepts," so a thief who steals a blank-indorsed note might be able to enforce it without owning it. *Id.* And that makes sense—in that scenario, the thief deprived the owner of both actual and constructive possession of the blank-indorsed note, thereby depriving the owner of the right to enforce the note. But, though some cynics may beg to differ, lawyers are not thieves, and when a lawyer holds a financial instrument on behalf of a client through an agency relationship, the lawyer has not deprived the client of his or her right of possession. Rather, unlike in the case of a thief, "the

---

[16] Moreover, constructive possession applies because Chase's foreclosure counsel was not a holder-in-due-course. *See Georg*, 178 P.3d at 1214. To be a holder-in-due-course, Chase's foreclosure counsel must have (among other things) obtained the Note for value. *Id.* at 1213. Unlike in *La Junta State Bank*, *see* 727 P.2d at 53, the record here does not create a factual question about whether Chase gave its counsel a $2,000,000 promissory note in return for value.

[lawyer's] possession would be the owner's possession and thus the owner would have 'possession.'" *Georg*, 178 P.3d at 1213–14 (emphasis and citation omitted).

We hold that Chase maintained constructive possession of the Note when it gave custody of the Note to its foreclosure counsel. Accordingly, we agree with and affirm the bankruptcy court's ruling that Chase did not transfer or negotiate to its foreclosure counsel a $2,000,000 promissory note.

### B.     The Purchase and Assumption Agreement

Section 3.3 of the Purchase and Assumption Agreement requires conveyances between the FDIC and Chase to be documented, "as necessary," by either a receiver's deed or bill of sale. App. vol. 8 at 1968 (capitalization removed). Kim and Foster argue next that because the FDIC did not provide this documentation, "the legal basis upon which Chase could have obtained title" is absent. Appellants' Opening Br. 47.

Kim and Foster's only supporting case is *Kim v. JPMorgan Chase Bank*, 825 N.W.2d 329 (Mich. 2012).[17] There, the plaintiffs' mortgage had been acquired by Chase from Washington Mutual. *Id.* at 330. When the FDIC became Washington Mutual's receiver, it executed a Purchase and Assumption Agreement with Chase. *Id.* at 330–31. Chase then later attempted to foreclose on the mortgage. *Id.* at 331. Even though Chase had purchased the mortgage through the Purchase and Assumption Agreement, the trial court ruled that Chase had acquired the mortgage "by operation of law," a conclusion that meant that Chase did not need to comply with a Michigan

---

[17] The Kim here is different than the Kim in this Michigan case.

statute requiring "that a mortgage assignment be recorded before initiation of a foreclosure by advertisement." *Id.* If Chase had acquired the mortgage by operation of law, it had not acquired it through a mortgage assignment. *See id.*

On review, the Michigan Supreme Court concluded that the FDIC had acquired Washington Mutual's assets by operation of law, because it became a receiver under 12 U.S.C. § 1821(d)(2)(A)(i)–(ii). *Id.* at 333. On the other hand, the court ruled that Chase had not acquired Washington Mutual's assets by operation of law, but that Chase had instead acquired them through a "voluntary transaction"—the Purchase and Assumption Agreement with the FDIC. *Id.* at 334. Thus, the Michigan Supreme Court ruled that Chase needed to comply with Michigan statutory law and publicly record its assignment of mortgage before foreclosing. *Id.* at 336.

Not once in the *Kim* opinion did the Michigan Supreme Court mention section 3.3 of the Purchase and Assumption Agreement, a receiver's deed, or a receiver's bill of sale. True, *Kim* might stand for the limited proposition that Chase acquired Washington Mutual's assets through the Purchase and Assumption Agreement rather than through operation of law. But it does not support the argument that the FDIC's failure to comply with section 3.3 voided the transaction. Moreover, as the district court recognized, section 3.3 does not even apply to every transfer under the agreement, because it is limited to "conveyances where a receiver's deed or receiver's bill of sale is 'necessary.'" App. vol. 5 at 1258. That limitation establishes that, in some cases, assignments between the FDIC and Chase could be made without a receiver's deed or bill of sale.

40

Here, Kim and Foster fail to explain how this was the type of transaction in which a receiver's deed or bill of sale was necessary. And even if it were such a transaction, we fail to see how the FDIC's breach of that provision would invalidate the transaction with Chase. Only a material breach of a contract gives the nonbreaching party a right to set aside the contract. *See Coors v. Sec. Life of Denver Ins.*, 112 P.3d 59, 64 (Colo. 2005) (citing *Sci. Packages, Inc. v. Gwinn*, 301 P.2d 719, 722 (1956)). Kim and Foster do not claim that this breach equated to a material breach. What is more, even if it had been a material breach, nothing prevents the nonbreaching party—here, that would be Chase—from preserving the contract and performing in spite of the breach. *Sci. Packages*, 301 P.2d at 722. Because Chase elected to purchase Washington Mutual's assets through the Purchase and Assumption Agreement, Chase upheld the contract. Thus, we conclude that the FDIC's failure to provide Chase with a receiver's deed or bill of sale, if one was even necessary, is irrelevant to whether Chase acquired Kim's Note.[18]

## CONCLUSION

Admissible evidence establishes that Chase possessed the original Note in September 2009 and scanned it into its electronic-recordkeeping system at that time. Because Chase possessed the Note and it was indorsed in blank, this means that

---

[18] Kim and Foster also claim that the bankruptcy court violated public policy, because the order allowed Chase's claim to persist even though it never had "possession of the original blank-endorsed Note" and did not present "evidence required to satisfy C.R.S. §4-3-309." Appellants' Opening Br. 51. Our conclusion that the bankruptcy court did not clearly err by relying on Lea's testimony precludes this argument.

41

Chase had the right to enforce the Note. And Chase never surrendered that right by sending the Note to its foreclosure counsel because, through an agency relationship, Chase maintained constructive possession of the Note. For these and other reasons mentioned, we affirm the bankruptcy court's denial of Kim and Foster's objection to Chase's proof of claim.

Entered for the Court


Gregory A. Phillips
Circuit Judge