**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 29, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

BAKHTIYOR JUMAEV,

    Petitioner,

v.

MERRICK B. GARLAND,
United States Attorney General,

    Respondent.

No. 21-9513
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **MATHESON**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.

_____

Bakhtiyor Jumaev, a native of the former Soviet Union and a citizen of

Uzbekistan, petitions for review of a Board of Immigration Appeals (BIA) opinion

upholding an Immigration Judge's denial of his application for deferral of removal

under the Convention Against Torture (CAT).[1]  Exercising jurisdiction under

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Mr. Jumaev does not contest the denial of his requests for asylum and withholding of removal, so we do not address those claims.  *See United States v.*

8 U.S.C. § 1252(a), we deny the petition.

## BACKGROUND

In April 2000, Mr. Jumaev, then thirty-three years old, left his wife and children in Uzbekistan and entered the United States on a tourist visa.  He relocated to Philadelphia from New York without informing immigration authorities, and he remained in the United States after his visa expired in October 2001.

In December 2009, Mr. Jumaev met Jamshid Muhtorov, a Denver resident and a fellow Uzbek.  The two men had similar backgrounds, including their Muslim faith and shared interest in the Islamic Jihad Union (IJU), a designated foreign terrorist organization.

In February 2010, the Department of Homeland Security (DHS) served Mr. Jumaev with a notice to appear, charging him with removability for failure to comply with the limits of his permissible stay, 8 U.S.C. § 1227(a)(1)(B), and for failing to notify the Attorney General of his change of address, *id.* § 1227(a)(3)(A). Mr. Jumaev was placed in detention but was released on a $3,500 bond after friends and acquaintances raised the funds, with Mr. Muhtorov contributing $500.

When Mr. Jumaev was released from custody, he called Mr. Muhtorov and thanked him.  They "developed a long-distance friendship" and communicated frequently about "a wide variety of topics," including the IJU, the history of terrorist

---

*Channon*, 881 F.3d 806, 811 n.7 (10th Cir. 2018) (noting arguments not raised in the briefs are waived).

organizations, and related propaganda videos they found online. Admin. R., vol. 1 at 1016. Federal authorities intercepted some of their communications during foreign intelligence surveillance. Mr. Jumaev repeatedly told Mr. Muhtorov he would return the money Mr. Muhtorov paid to facilitate his release from detention. In March 2011, Mr. Muhtorov told him that the IJU "was in dire need of financial support." *Id.* Mr. Jumaev said that he would send a partial payment, and Mr. Muhtorov indicated that "he would send this money to brothers and . . . they [would do] their things." *Id.* at 404. Mr. Jumaev then sent Mr. Muhtorov $300 "us[ing] a friend's check." *Id.* at 1016. Mr. Muhtorov received the check, and his wife cashed it. Mr. Jumaev followed up by confirming that Mr. Muhtorov received the "wedding gift." *Id.* (internal quotation marks omitted).

Mr. Jumaev later testified that "a wedding gift" was innocuous jargon used for repaying a debt and that he believed Mr. Muhtorov's statement about sending the money to "brothers" was "a joke." *Id.* at 402-04. But the government understood the word "wedding" to be "a code word that referred to the Jihadist cause." *United States v. Jumaev*, 20 F.4th 518, 529 (10th Cir. 2021) (internal quotation marks omitted). And "Mr. Muhtorov bragged to Mr. Jumaev and others for months about his scheme to go to Turkey to study and then to travel for 'the wedding,'" with Mr. Jumaev "encourag[ing] Mr. Muhtorov and even stat[ing] that he was envious." Admin. R., vol. 1 at 1017. In January 2012, Mr. Muhtorov bought a one-way ticket to Turkey and told his wife he might not return. He was arrested at Chicago O'Hare International Airport, with nearly $3,000 in cash, two new iPhones, and a new iPad.

FBI agents then interviewed Mr. Jumaev, who "was not fully forthright," including "as to his use of code words with Mr. Muhtorov, the full scope of their discussions, and his internet activity." *Id.* Mr. Jumaev was arrested in March 2012 and charged under 18 U.S.C. § 2339B with providing, attempting to provide, and conspiring to provide material support to a designated foreign terrorist organization. After he spent more than six years in pretrial detention, a jury found Mr. Jumaev guilty, and the district court sentenced him to time served and ten years' supervised release. *See Jumaev*, 20 F.4th at 532. We affirmed the judgment. *Id.* at 528.

Upon his release from prison, U.S. Immigration and Customs Enforcement served Mr. Jumaev with an additional charge of removability, alleging he was removable under 8 U.S.C. § 1227(a)(4)(B) for engaging in terrorist activity by providing material support to a terrorist organization. *See* Admin. R., vol. 1 at 1597. Mr. Jumaev applied for asylum, withholding of removal, and protection under the CAT, alleging that he faced severe persecution and state-sponsored torture in Uzbekistan because of his religion and his convictions. An IJ found Mr. Jumaev was barred from asylum and withholding of removal under the Immigration and Nationality Act (INA) and the CAT because of his convictions and because he was a danger to the security of the United States. The IJ also denied deferral of removal under the CAT after determining Mr. Jumaev did not prove it was more likely than not that he would be tortured in Uzbekistan. The BIA dismissed Mr. Jumaev's appeal and upheld his removal.

4

## DISCUSSION

Mr. Jumaev challenges the agency's denial of his deferral application on two grounds.  First, he argues the BIA's opinion was not supported by substantial evidence.  Second, he argues the BIA's opinion violated his due process rights because the BIA did not review a material part of the record in reaching its decision.

### I.    Deferral of Removal under the CAT

#### A.    Eligibility for Deferral

Noncitizens who are ineligible for withholding of removal may still be eligible for deferral of removal under the CAT.  *See* 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). Deferral of removal provides "a less permanent form of protection than withholding of removal and one that is more easily and quickly terminated if it becomes possible to remove the [noncitizen] consistent with [the CAT]," while also "ensur[ing] that [such noncitizens] are not returned to a country where they would be tortured." Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480-81 (Feb. 19, 1999).

For deferral, a noncitizen must prove "it is more likely than not that he . . . would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2), (4); *see also Escobar-Hernandez v. Barr*, 940 F.3d 1358, 1362 (10th Cir. 2019) (the noncitizen bears the burden to show he has met the requirements for CAT relief).  Relief "is mandatory" if a noncitizen makes such a showing.  *Igiebor v. Barr*, 981 F.3d 1123, 1127-28 (10th Cir. 2020) (internal quotation marks omitted).

5

"Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official . . . ." 8 C.F.R. § 1208.18(a)(1). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." *Id.* § 1208.18(a)(2). "[A]ll evidence relevant to the possibility of future torture shall be considered, including": (1) "past torture inflicted upon the [noncitizen]"; (2) whether the noncitizen "could relocate to a part of the country of removal where he . . . is not likely to be tortured"; (3) "gross, flagrant or mass violations of human rights within the country of removal"; and (4) "[o]ther relevant information regarding conditions in the country of removal." *Id.* § 1208.16(c)(3). "[T]he existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute sufficient grounds for" relief under the CAT. *In re J-E-*, 23 I. & N. Dec. 291, 303 (B.I.A. 2002) (en banc). "Specific grounds must exist that indicate the individual would be personally at risk." *Id.*

## B. Agency Proceedings

Mr. Jumaev appeared for a hearing before the IJ. Two witnesses testified on his behalf: (1) Mr. Jumaev himself; and (2) Dr. Adeeb Khalid, a professor and an expert on Uzbekistan's history and culture. The DHS did not call any witnesses.

The IJ denied deferral under the CAT. The IJ found Mr. Jumaev to be "not credible," noting that "[t]he record and [Mr. Jumaev's] testimony are replete with

inconsistencies, admissions of falsehoods, and contradictory versions of events" on "material" aspects of his claim. Admin. R., vol. 1 at 240. The IJ articulated numerous reasons why this adverse-credibility determination cast doubt on Mr. Jumaev's narrative of past torture. *See, e.g.*, *id.* at 241 ("[Mr. Jumaev] admitted [in testimony in his criminal trial in federal district court] that his account of his arrest [in Uzbekistan] in June 1999, the critical event forming the basis of his fear of returning to Uzbekistan, was a lie."). The IJ then considered country-conditions evidence and evaluated whether Mr. Jumaev had established that an individual with his characteristics and notoriety would likely face torture upon return to Uzbekistan. The IJ found that evidence in this case—including "objective evidence [of] human rights violations and torture in Uzbekistan," *id.* at 249—"presents a general possibility of torture, but does not meet [Mr. Jumaev's] high burden of establishing that it is more likely than not that *he* will be targeted for such treatment." *Id.* at 252.

The BIA "discern[ed] no clear error in the [IJ's] underlying factual findings" and found the record supported "the [IJ's] ultimate conclusion"—namely, that Mr. Jumaev did not "meet the heavy burden of showing that it is more likely than not that [he] would face torture, at or with the acquiescence (including willful blindness) of a government official, upon removal to Uzbekistan." *Id.* at 20, 22. Accordingly, the BIA dismissed Mr. Jumaev's appeal.

## C.    Standard of Review

The BIA's decision was a full explanatory opinion by a three-member panel. *See* 8 C.F.R. § 1003.1(e)(6). Under "this method, the BIA opinion completely

7

super[s]edes the IJ decision for purposes of our review." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1203 (10th Cir. 2006). Mr. Jumaev acknowledges this court is reviewing the BIA's opinion, *see* Pet'r's Opening Br. at 12, but indiscriminately challenges the IJ's reasoning without regard to whether the BIA adopted or referenced it. We confine our review to the BIA's opinion and to those portions of the IJ's reasoning that the BIA expressly referenced or adopted within the opinion.[2]

We review the BIA's legal determinations de novo and its factual findings for substantial evidence. *Igiebor*, 981 F.3d at 1131. Under the substantial-evidence standard, "the agency's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Birhanu v. Wilkinson*, 990 F.3d 1242, 1252 (10th Cir. 2021) (brackets and internal quotation marks omitted). The substantial-evidence standard is "highly deferential." *Kabba v. Mukasey*, 530 F.3d 1239, 1244 (10th Cir. 2008).

### D.    The BIA's Opinion

The BIA noted that Mr. Jumaev did not challenge the IJ's adverse-credibility determination, which was based on "inconsistencies between his two asylum applications and his admission that he lied in his 2011 asylum application." Admin.

---

[2] *See Sarr v. Gonzales*, 474 F.3d 783, 791 (10th Cir. 2007) ("Our procedures for judicial review respect the BIA's discretionary decision to adopt the IJ's opinion in part or in whole (or not at all). . . . [L]awyers may find it convenient for us to expand the scope of our review to include portions of the IJ's opinion that were not explicitly or implicitly adopted by the BIA, but that would come at the cost of respect for the agency's own judgment regarding its ground for decision.").

R., vol. 1 at 19.  In addition, it incorporated the IJ's entire credibility analysis into its decision.  But the BIA did not deny relief on this ground.  *Cf. Niang v. Gonzales*, 422 F.3d 1187, 1202 (10th Cir. 2005) (affirming denial of CAT relief where there was an adverse-credibility determination because if one factor in the § 1208.16(c)(3) assessment is discredited, "one could rationally decide that [an applicant] had failed to show" a likelihood of torture upon return to the proposed country of removal).

Instead, the BIA considered whether record evidence establishing the occurrence of human-rights violations and torture in Uzbekistan, including country-conditions evidence and expert testimony, "reflects that [Mr. Jumaev], an Uzbek citizen who is a practicing Muslim and who incurred two convictions for providing material support to [a foreign terrorist organization], faces a probability of torture with the consent or acquiescence of the government."  Admin. R., vol. 1 at 21. The BIA recognized "the repressive nature of the regime and reports of abuses that occur."  *Id.*  And it considered that Mr. Jumaev might be questioned or detained upon return to Uzbekistan and could face criminal charges.  But it reasoned that Mr. Jumaev had not carried his burden to establish that he would be singled out for torture due to his religion or convictions.

### 1.    The BIA did not ignore or improperly discount uncontroverted evidence.

The gist of Mr. Jumaev's argument is that the agency "ignored or discounted without reasoned explanation" uncontroverted country-conditions evidence and expert testimony showing he is likely to be tortured upon his return to Uzbekistan.

Pet'r's Opening Br. at 4. We are not persuaded. As explained below, we are limited to the highly deferential substantial-evidence standard in reviewing the BIA's denial of Mr. Jumaev's deferral application. Under that standard, we conclude that even if a reasonable adjudicator could disagree with the BIA's denial of deferral, Mr. Jumaev has not satisfied his burden to show that a reasonable adjudicator would be compelled to do so.

### a. The BIA considered country-conditions evidence and Dr. Khalid's testimony.

The BIA considered Mr. Jumaev's country-conditions evidence and agreed with him that "evidence of record established the occurrence of human rights violations and torture in Uzbekistan." Admin. R., vol. 1 at 21. The BIA expressly acknowledged "the repressive nature of the regime and reports of abuses that occur," as well as "reported incidents of mistreatment of Uzbek citizens due to religion," "very poor" detention conditions, and government tracking of Uzbek citizens. *Id.* at 20-21. And the BIA found no clear error in the IJ's numerous factual findings to the same effect.

The BIA also considered Dr. Khalid's testimony, as evident from its references to his opinions that (1) Mr. Jumaev "would be likely to be questioned upon his return to Uzbekistan"; (2) "he might be detained at some point upon return in conditions that are very poor"; and (3) there was a "high risk that [he] would face a range of

10

criminal charges."[3]  *Id.* at 21.  The BIA concluded that the likelihood of these events did "not, in and of itself, satisfy the burden to prove torture [of Mr. Jumaev] is more likely than not to occur."  *Id.*

Although the BIA did not recount every piece of country-conditions evidence and every detail of Dr. Khalid's testimony,

> the BIA is not required to discuss every piece of evidence when it renders a decision.  Although the BIA is required to provide more than just conclusory statements, all that is necessary is a decision that sets out terms sufficient to enable us as a reviewing court to see that the Board has heard, considered, and decided.

---

[3] Mr. Jumaev contends the IJ and BIA erred by linking questioning, detention, and criminal charges into "a singular hypothetical chain of events that would lead to [his] torture" and denying his claim for failure to establish each link was more likely than not to occur.  Pet'r's Opening Br. at 30 (boldface omitted).  But the cited portion of the IJ's decision was superseded by the BIA decision, which specifically rejected this approach, *see* Admin. R., vol. 1 at 21 n.6, and did not employ such reasoning.  Instead, the BIA cited *Matter of M-B-A-*, 23 I. & N. Dec. 474, 479-80 (B.I.A. 2002), for the principle that a deferral claim under the CAT cannot be "based on a chain of assumptions and a fear of what might happen, rather than evidence that meets [the applicant's] burden of demonstrating that it is *more likely than not* that [he] will be subjected to torture by, or with the acquiescence of, a public official or other person acting in an official capacity if [he] is returned to [his] home country").  The claim rejected in *Matter of M-B-A-* resembles Mr. Jumaev's claim in that it necessitates speculation and presupposes a series of events:

> The respondent's eligibility for deferral of removal rests upon a finding that it is more likely than not that she will be identified as a convicted drug trafficker upon her return to Nigeria; that, as a result, she will be detained on arrival; that, when detained, she will be held in detention without access to bail or judicial oversight; that she will be detained for a significant period of time; and that, as a result of this detention, she will suffer mistreatment that rises to the level of torture at the hands of prison guards or authorities.

*Id.* at 479.

*Hadjimehdigholi v. INS*, 49 F.3d 642, 648 n.2 (10th Cir. 1995) (internal quotation marks omitted); *see also Becerra-Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir. 1987) ("[The BIA] has no duty to write an exegesis on every contention." (internal quotation marks omitted)).  Here, the BIA provided sufficient terms to allow appellate review.

### b.      Dr. Khalid's testimony would not compel a reasonable adjudicator to conclude torture is likely.

Dr. Khalid opined that (1) "it is very likely" Mr. Jumaev will be tortured if returned to Uzbekistan, Admin. R., vol. 1 at 476; (2) he did not think it was "safe for [Mr. Jumaev] to return to any part of Uzbekistan," *id.* at 472; (3) it "is very likely that [Mr. Jumaev] will arrive at the airport, he will scan his passport and that will trigger all sorts of alerts and he will be taken into custody[, a]nd after that, the likelihood of torture is great," *id.* at 476; (4) "it's quite likely" that Mr. Jumaev's "conviction would cause him to be subject to criminal prosecution in Uzbekistan," and he "imagine[d] that they would throw the book at him," *id.* at 473; and (5) "he will probably be sentenced to prison . . . . I would imagine that prosecution is pretty much certain," *id.* at 474.  He also stated in his expert report that Mr. Jumaev would "be a prime candidate for torture and ill treatment . . . from the moment he sets foot in the country." *Id.* at 1159.

But Dr. Khalid's conclusions were based largely on general background information and lacked sufficient support to compel a reasonable adjudicator to agree

with them.  His testimony, when read as a whole,[4] drew inferences from his study of country conditions rather than from direct, personal experience or concrete facts or data.  *See, e.g.*, *id.* at 476 ("[A]s far as I understand the situation in Uzbekistan, it is very likely that he'll be tortured, yes. . . . [That is] based on my research and I've had no personal experience with any of this but what I have read and what has been reported in the present [sic] by various human rights organizations.").  Dr. Khalid conceded he had not read any report about "a situation similar or akin to Mr. Jumaev where the person has actually come into the country and been arrested and detained." *Id.* at 479-80.  And he candidly acknowledged that he is "not entirely up on the legalities of [the] Uzbek criminal justice system on this case."  *Id.* at 473.  The evidentiary gaps in his testimony weakened his conclusions about the likelihood of torture.

Furthermore, other parts of Dr. Khalid's testimony were tentative.  For example, he opined that "any number of things could happen" to someone with Mr. Jumaev's religious background who is labeled "an extremist."  *Id.* at 470.  "You could simply be sent to jail or you could be let go with a warning and you would be under surveillance and be liable to be hauled in at any time that the local authorities deem necessary."  *Id.*  Additionally, he characterized the Uzbekistani National

---

[4] Although Dr. Khalid's testimony spanned 12 pages of direct examination and 4 pages of cross examination, much of it was devoted to his qualifications, his role as an expert witness in Mr. Jumaev's criminal trial, his job as a history professor specializing in Uzbek history from the late 19th century to the present, the history of Uzbekistan, and the Uzbekistani National Security Service.

Security Service's ways as "unpredictable." *Id.* at 478. These qualifications also diluted Dr. Khalid's opinion.

Although the BIA did not address all of Dr. Khalid's testimony, we read its analysis as assessing the expert's credibility and weighing the evidence presented. These inquiries are firmly within the agency's discretion. "We neither reweigh the evidence nor assess witness credibility." *Vladimirov v. Lynch*, 805 F.3d 955, 960 (10th Cir. 2015).

Under these circumstances, we cannot say that Mr. Jumaev has met his burden to show under the substantial-evidence standard that the BIA improperly "discounted or ignored" Dr. Khalid's testimony, *see* Pet'r's Opening Br. at 15 (boldface omitted). Even if the country-conditions evidence and Dr. Khalid's testimony could have persuaded a reasonable adjudicator on de novo review, the aforementioned shortcomings preclude appellate relief under our highly deferential substantial-evidence standard.

**2.      The BIA did not err in requiring Mr. Jumaev to prove he would be singled out for torture.**

There is agreement that Uzbekistan is controlled by a violent, repressive regime and that human-rights violations and torture routinely occur in Uzbekistan. But "the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute sufficient grounds for" relief under the CAT. *In re J-E-*, 23 I. & N. Dec. at 303; *see also Escobar-Hernandez*, 940 F.3d at 1362 ("[B]y itself, pervasive violence in an

14

applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there."). "Specific grounds must exist that indicate the individual would be personally at risk." *In re J-E-*, 23 I. & N. Dec. at 303. The BIA agreed with the IJ's reasoning that Mr. Jumaev's evidence showed general, indiscriminate abuse and torture in Uzbekistan, but did not adequately prove a particularized risk to him. *See* Admin. R., vol. 1 at 21 n.5; *see also id.* at 21 ("We discern no clear error in the [IJ's] findings that the indiscriminate nature of the Uzbek regime's abuses does not reflect the requisite likelihood of the respondent's future torture, even considering that he might be detained at some point upon return in conditions that are very poor.").

Mr. Jumaev contends that "he has demonstrated by uncontroverted expert testimony and voluminous country reports that (1) he has been tortured in the past, and (2) that it is more likely than not that he will be tortured should he be removed to Uzbekistan." Pet'r's Opening Br. at 30. But as established above, Dr. Khalid's testimony did not rest on a sufficiently solid foundation and was not as definitive as Mr. Jumaev says it was, so it did not "dictate[]" a finding that Mr. Jumaev is more likely than not to face torture upon return to Uzbekistan. *Id.* at 13 (boldface and capitalization omitted). Moreover, country reports speak to general conditions in Uzbekistan—not the likelihood that Mr. Jumaev will be singled out for torture. As for past torture, the IJ methodically sifted through the record and detailed "inconsistencies, admissions of falsehoods, and contradictory versions of events" in his accounts of past mistreatment and torture in Uzbekistan—all of which contributed

15

to the unchallenged adverse-credibility determination. Admin. R., vol. 1 at 240. For these reasons, he has not met his burden under the substantial-evidence standard.

Mr. Jumaev also contends the BIA adopted the IJ's "unreasonable" "requirement that [he] show specific, particularized evidence that those with a conviction in the U.S. similar to [his] are targeted for torture in Uzbekistan." Pet'r's Opening Br. at 27 (boldface omitted). This is not the case. The BIA described Mr. Jumaev's religious background and conviction in discussing the particularized-risk requirement. And it stated that the IJ "analyzed the record to determine if the objective evidence supported [Mr. Jumaev's] premise, i.e., that he would be tortured upon return to Uzbekistan due to his conviction in the United States or his support for the [Islamic Jihad Union]." Admin. R., vol. 1 at 21 n.6. But the BIA never imposed such a stringent, specific standard.

Applying the highly deferential standard of review that governs this case, we cannot say that any reasonable adjudicator would be compelled to reach a conclusion contrary to the BIA's.

## II. Incomplete Record

Mr. Jumaev next argues that his due process rights were violated because the BIA failed to review the complete record. He contends that the record before the IJ included a sealed transcript from his criminal trial of testimony by a Confidential

16

Human Source (CHS)—an Uzbek informant—and that the BIA's failure to review the CHS transcript deprived him of his right to be heard in a meaningful manner.[5]

On appeal, the BIA indicated it reviewed the record. *See, e.g.*, Admin. R., vol. 1 at 20 (stating that the IJ's "ultimate conclusion is supported by the record"). The BIA also explained: (1) the IJ "considered evidence from [Mr. Jumaev's] criminal trial that was provided under seal" and "cited by the parties in closing arguments"; and (2) "[b]y order dated January 13, 2020, a federal judge granted the [BIA] access to these sealed materials for purposes of adjudicating this appeal." *Id.* at 20 n.4. But in compiling the administrative record for this court, the parties discovered that the BIA never obtained (and thus could not have reviewed) the CHS transcript.

In immigration proceedings, the record includes "[t]he hearing before the [IJ], including the testimony, exhibits, applications, proffers, and requests, the [IJ's] decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings." 8 C.F.R. § 1240.9; *see also* 8 U.S.C. § 1229a(b)(4)(C) ("[A] complete record shall be kept of all testimony and evidence produced at the [immigration] proceeding."). On appeal to the BIA, the record "shall be promptly forwarded to the [BIA] upon the request or the order of the [BIA]." 8 C.F.R. § 1003.5(a).

---

[5] We have reviewed the CHS transcript, which was filed under seal in this court pursuant to an order granting the parties' joint motion.

Due process requires:  (1) "that the decisionmaker actually consider the evidence and argument that a party presents," *de la Llana-Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994); and (2) "meaningful appellate review," which "is not possible" without "a complete record of the proceeding" because the reviewing body "cannot meaningfully scrutinize the proceedings below," *Witjaksono v. Holder*, 573 F.3d 968, 974 (10th Cir. 2009) (internal quotation marks omitted).  But to establish a due process violation, a noncitizen must demonstrate prejudice.  *Id.* at 974-75.  And for a due process claim based on an incomplete record, a noncitizen cannot demonstrate prejudice if the missing portions of the record are immaterial, would not have changed the outcome of the proceedings, or could have been recreated by the noncitizen at the BIA level.[6]  *Id.* at 975; *see also United States v.*

---

[6] In his opening brief, Mr. Jumaev recognizes that such circumstances would preclude a finding of prejudice for a due process violation.  *See* Pet'r's Opening Br. at 38.  But in his reply brief, he changes course and argues that the BIA "failed to comply with its own regulations and prejudice can thus be *presumed*."  Pet'r's Reply Br. at 11 (emphasis added) (citing *Matter of Garcia-Flores*, 17 I. & N. Dec. 325 (B.I.A. 1980)).  Because this presumed-prejudice argument is not in his opening brief, it is waived.  *See Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019) ("Issues not raised in the opening brief are deemed abandoned or waived." (internal quotation marks omitted)); *see also United States v. Holbert*, 285 F.3d 1257, 1263 (10th Cir. 2002) (stating this rule is "especially apt" where a party "not only failed to argue the issue in his opening brief, but expressly conceded it, consequently focusing the attention of the [opposing party] and of this court on other issues").  In any event, the argument is not persuasive and would not change the outcome.  The BIA stated in *Garcia-Flores* that prejudice "can" be presumed "[w]here compliance with [a]n [agency] regulation is mandated by the Constitution . . . [or] where an entire procedural framework, designed to insure the fair processing of an action affecting an individual[,] is created but then not followed by an agency." 17 I. & N. Dec. at 329.  But the BIA also articulated a "general rule" that "prejudice will have to be specifically demonstrated."  *Id.*  And it did not presume prejudice where an

18

*Aguirre-Tello*, 353 F.3d 1199, 1209 (10th Cir. 2004) (en banc) (holding that

prejudice for a due process claim requires a reasonable likelihood of a different

outcome).  Our review of due process claims premised on an incomplete or deficient

record is de novo.  *Witjaksono*, 573 F.3d at 973-74.

Mr. Jumaev has not shown he was prejudiced and, thus, has not established a

due process violation.  First, he did not rely on the CHS transcript in his appeal to the

BIA, belying his depiction of the transcript's significance.  He did not mention the

transcript at all in his lengthy notice of appeal.  And in his brief to the BIA, he

referenced it only in passing—a "see also" citation in a footnote—as *additional*

support for his allegation that security agents interrogate Uzbekistan residents

following a lengthy stay outside the country.  *See* Admin. R., vol. 1 at 132 & n.48.

Second, the information in the CHS transcript is largely duplicative of other

evidence before the BIA.  The district judge overseeing Mr. Jumaev's criminal trial

granted the IJ and counsel for the parties in the immigration proceeding limited

access to the CHS transcript.  After reviewing the transcript in camera, the parties

agreed to file one set of closing statements that did not reference the transcript and a

supplemental set of closing statements that addressed the transcript's import.  The

supplemental closing statements to the IJ were "placed in the Record of Proceedings

---

immigration officer failed to advise the noncitizen of his rights under 8 C.F.R.
§ 287.3 (i.e., the right to be represented at no expense to the government) and under
the Fifth Amendment—a violation that seems more egregious than the BIA's failure
to review a sealed transcript that was duplicative of other record evidence.

and sealed." *Id.* at 180; *see also id.* at 182 (noting that the agency record included "the documents submitted . . . under seal"). Indeed, Mr. Jumaev's description of the significance of the CHS transcript in his opening brief to this court echoes those supplemental closing statements to the IJ, which were part of the record before the BIA. *See* Admin. R., vol. 2 at 230-33 (Sealed).

In addition, Mr. Jumaev argues that the CHS transcript *corroborated* the expert testimony and country-conditions evidence as to the origins, power, and tactics of the Uzbekistani National Security Service. *See* Pet'r's Opening Br. at 42-44. But there was extensive evidence before the agency on this point. And the IJ made factual findings, which the BIA upheld, that Mr. Jumaev "will more likely than not be interrogated upon return to Uzbekistan," as security agents are "present at Uzbek airports" and "scrutinize[] . . . and interrogate[] individuals returning to Uzbekistan from other countries." Admin. R., vol. 1 at 249-50. The CHS transcript does not shed additional light on the central question—"whether [*Mr. Jumaev*] would more likely than not be tortured." *Id.* at 251.

We do not discern any prejudice under these circumstances. Although the BIA did not obtain, and thus review, the CHS transcript, there is no reasonable likelihood of a different outcome had the BIA reviewed the CHS transcript. Accordingly, Mr. Jumaev's due process claim fails.

## CONCLUSION

The petition for review is denied.

Entered for the Court

Gregory A. Phillips
Circuit Judge