IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

FRANCISCO SANTIAGO TAPIA-MUNOZ, *Appellant.*

No. 1 CA-CR 24-0260

FILED 10-29-2025

Appeal from the Superior Court in Yuma County
No. S1400CR202201349
The Honorable David M. Haws, Judge

**AFFIRMED**

COUNSEL

Zachary Law Group, PLC, Mesa
By Jessica Zachary
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

---

**OPINION**

---

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Anni Hill Foster and Judge Paul J. McMurdie joined.

---

**B R O W N**, Judge:

¶1        Francisco Tapia-Munoz appeals from his convictions and sentences for two counts of first-degree murder, and one count each of attempted murder, aggravated assault, and unlawful flight. Among the issues raised on appeal, he argues the trial court erred in overruling his hearsay objection to the contents of a cell phone extraction report. Because the report was generated automatically and its contents could not be influenced or altered by any human, we conclude the statements were not hearsay. We therefore affirm.

## BACKGROUND

¶2        We view the evidence in the light most favorable to sustaining the jury's verdicts, resolving all reasonable inferences against Tapia-Munoz. *See State v. Fierro*, 254 Ariz. 35, 38, ¶ 2 (2022). In the early morning hours of November 12, 2022, Somerton police responded to a call about a man being shot multiple times. The victim, John, was lying on the sidewalk by a clinic, with blood coming from the back of his head.[1] Police found two bullet casings near John's body, as well as evidence at other locations nearby, including an intersection with casings and an alleyway with several other items.

¶3        Surveillance video footage showed a Buick sedan approach the area, with the driver shooting John at the intersection where the bullet casings were located. John then ran towards the alleyway to evade his assailant. The attacker pursued and ran over John with the Buick as he entered the alley. John was still able to stand up and flee to the clinic, where police ultimately found him, but he later died from his gunshot wounds. An automatic license plate reader took a photo of the Buick as it drove away from the clinic, with the license plate visible.

---

[1]        We use pseudonyms to protect the victims' identities.

¶4        Another incident occurred at a nearby casino shortly after the shooting.  The victim (Robert) and his fiancée were leaving the casino when they stopped before crossing a street to go toward the parking lot.  A car with a license plate matching a portion of the Buick's license plate stopped and allowed them to cross, after which the couple proceeded to Robert's vehicle.  The same car that had allowed them to cross drove back around and pulled up next to the couple.  The driver exited the car, shot and killed Robert, and drove away.  Later that day, Robert's fiancée identified the assailant as Tapia-Munoz in a photographic lineup.  Police also found a bullet casing and an unfired bullet in the casino parking lot.

¶5        Officers located the Buick later the same morning and set a perimeter around the neighborhood where the car was parked.  Around noon, Tapia-Munoz got in the Buick and tried to leave the area.  Despite law enforcement efforts to stop him, Tapia-Munoz sped out of the neighborhood past the police, and a chase ensued.  Tapia-Munoz eventually drove into another neighborhood, abandoned his vehicle, and fled on foot.  After several minutes of searching, officers located and arrested Tapia-Munoz.  Officers later searched the Buick and found a handgun with ammunition consistent with the casings found at both crime scenes.  Subsequent testing confirmed the casings had markings consistent with having been fired from Tapia-Munoz's gun.  Police also found several cellphones in the Buick.  Cell phone location data placed Tapia-Munoz in the vicinity of both crime scenes when the murders occurred.

¶6        The State charged Tapia-Munoz with two counts of first-degree murder, one count of attempted murder for the initial shooting of John, one count of aggravated assault for running over John with the car, one count of unlawful flight, and one count of misconduct involving weapons.  Before trial, Tapia-Munoz moved to sever the murder charge involving Robert from the offenses involving John under Arizona Rule of Criminal Procedure ("Rule") 13.4, asserting the two murders were "significantly different," and joinder would risk evidence of one murder becoming propensity evidence in the other.  Tapia-Munoz also moved to sever the misconduct involving weapons charge from the other offenses. The court granted his motion on the misconduct charge but denied it on the murder charge involving Robert, finding the offenses were "of the same or similar character" and were "connected in time, location and by over-lapping evidence."

¶7        The jury convicted Tapia-Munoz as charged.  During the aggravation phase, the jury found he committed each offense (except

unlawful flight) with the use of a deadly weapon or dangerous instrument, and the offenses were committed while he was lying in wait for the victim.

¶8        At sentencing, the court found Tapia-Munoz had prior felony convictions sufficient in number and quality to make him a category three repetitive offender, *see* A.R.S. § 13-703(C), and he committed the crimes while on release in a separate felony case, *see* A.R.S. § 13-708(D). The court sentenced Tapia-Munoz to consecutive terms of natural life in prison for each murder conviction. For attempted murder, the court imposed a 28-year sentence, noting the factors the jury found, the prior convictions, and the lack of any mitigating factors justified the sentence. For aggravated assault, the court again noted the jury's aggravating factors, along with the lack of any mitigation, and imposed a 20-year sentence. As to unlawful flight, even though the jury found no aggravating factors, the court found an "aggravated" six-year sentence was appropriate based on "the aggravating circumstances . . . found by the jury" along with lack of mitigation. Tapia-Munoz appealed, and we have jurisdiction under A.R.S. §§ 13-4031, -4033.

## DISCUSSION

¶9        Tapia-Munoz argues the trial court erred by (1) denying his motion to sever, (2) admitting the cell phone extraction report over his hearsay objection, and (3) committing sentencing errors.

### A.        Motion to Sever

¶10        According to Tapia-Munoz, the trial court abused its discretion in denying his motion to sever the first-degree murder count as to Robert from the remaining counts related to John's death. But given that Tapia-Munoz failed to renew his motion at the close of evidence, we review the court's denial only for fundamental error. *See State v. Allen*, 253 Ariz. 306, 332, ¶ 50 (2022); *State v. Laird,* 186 Ariz. 203, 206 (1996); *see also* Ariz. R. Crim. P. 13.4(c) (requiring defendant to renew a motion to sever during trial before or at the close of evidence, and that the right to severance under the rule is waived if the defendant "fails to timely . . . renew a proper motion").

¶11        To establish fundamental error, Tapia-Munoz must show trial error occurred, the error was fundamental, and the error caused him prejudice. *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). To establish prejudice, Tapia-Munoz must show that without the error, a reasonable jury could have reached a different verdict. *Id.* at 144, ¶ 29. This standard is not easily satisfied; it is an objective inquiry that "necessarily excludes imaginative guesswork." *Id.* at ¶ 31.

¶12        Arizona Rule of Criminal Procedure 13.3(a) allows "[t]wo or more offenses [to] be joined in an indictment, information, or complaint if they are each stated in a separate count" and the offenses: "(1) are of the same or similar character; (2) are based on the same conduct or otherwise connected together in their commission; or (3) are alleged to have been a part of a common scheme or plan."  If the offenses are joined only because they are of the same or similar character, *see* Ariz. R. Crim. P. 13.3(a)(1), the defendant is entitled to severance as a matter of right unless "evidence of the other offense [] would be admissible if the offenses were tried separately."  Ariz. R. Crim. P. 13.4(b).

¶13        Tapia-Munoz contends the court erred because much of the evidence related to each murder would not have been admissible had the offenses been tried separately.  He points to the surveillance footage capturing John's murder, ballistic evidence recovered from that murder, and eyewitness testimony from Robert's fiancée that would not have been cross-admissible.  According to Tapia-Munoz, this constituted improper propensity evidence of other bad acts.

¶14        We need not determine whether the court erred in denying the motion to sever because Tapia-Munoz has not presented any argument in his briefing regarding fundamental error or prejudice.  Nor has he pointed to anything in the record showing the failure to sever the charges caused the jury to improperly consider evidence of Robert's murder as support for the other offenses.  He offers only speculation that the jury improperly considered evidence from the different murders in finding him guilty, which is insufficient to establish prejudice.  *See Escalante*, 245 Ariz. at 144, ¶ 31.

¶15        Moreover, the court instructed the jury that "[e]ach count charges a separate and distinct offense" and that they "must decide each count separately on the evidence with the law applicable to it, uninfluenced by [their] decision on any other count."  The court further instructed the jury it could "find that the State has proved beyond a reasonable doubt all, some, or none of the charged offenses."  Tapia-Munoz has not identified anything in this record showing the court's denial of his motion to sever caused the jury to render any of its verdicts on an improper basis.  *See Allen*, 253 Ariz. at 334, ¶ 62 (citation omitted); *see also State v. Hausner*, 230 Ariz. 60, 75, ¶ 48 (2012) (concluding a defendant could not show prejudice when "the trial court instructed the jurors to consider each charged offense separately and advised them that the State had to prove each beyond a reasonable doubt.").  Tapia-Munoz has failed to show the court committed fundamental, prejudicial error in denying his motion to sever.

### B.     Hearsay

¶16     During trial the State introduced exhibits 541 and 542 to confirm a "Cellebrite" extraction police had performed on one of the cell phones found in the Buick.  As explained by one of the State's witnesses, a criminal intelligence analyst, Cellebrite is a "tool that is used to extract information from devices such as cell phones, SD cards, [and] SIM cards."  Cellebrite consists of a hardware component used to extract data from a phone along with software that processes the information and converts it to a viewable report.  The analyst noted that Cellebrite generates the report of the extracted data, and that he has no way of manipulating the information in the report.  The only information listed in the one-page Cellebrite reports is the cell phone number connected to the SIM for each of the two phones.  These were the same phone numbers used to collect the cell phone location data linking Tapia-Munoz to the crime scenes.  The trial court admitted the exhibits over Tapia-Munoz's objection under the business record exception to the hearsay rule.

¶17     Tapia-Munoz challenges the admission of the Cellebrite reports.  He argues the reports do not satisfy the business record hearsay exception found in Arizona Rule of Evidence ("Evidence Rule") 803(b)(6).  We review a court's ruling on hearsay for an abuse of discretion.  *State v. Franklin*, 232 Ariz. 556, 559, ¶ 10 (App. 2013).

¶18     Before deciding whether the exhibits meet the requirements of a hearsay exception, we first consider whether the reports constitute hearsay.  Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted."  Ariz. R. Evid. 801(c).  A "statement" is "a *person's* oral assertion, written assertion, or nonverbal conduct," and a "declarant" is "the *person* who made the statement."  Ariz. R. Evid. 801(a)–(b) (emphasis added).  Hearsay statements are generally inadmissible.  *See* Ariz. R. Evid. 802.

¶19     The State argues the Cellebrite reports are not hearsay because there is no "declarant" who could have provided a "statement" under this rule.  Federal courts have addressed similar questions, and because the Federal Rules of Evidence and the Arizona Rules of Evidence are identical on this topic, *compare* Ariz. R. Evid. 801(a)–(c), 802, *with* Fed. R. Evid. 801(a)–(c), 802, such authority is persuasive, *see State v. Delgado*, 232 Ariz. 182, 186, ¶ 11 (recognizing that when the Arizona Rules of Evidence mirror the Federal Rules of Evidence, federal court decisions are persuasive authority in analyzing Arizona's rules).

¶20     In *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109–10 (9th Cir. 2015), the Ninth Circuit determined that a "tack" placed on a map by Google Earth was not hearsay because it was not a "statement." The court explained that Google Earth users could type in GPS coordinates, and that the program would automatically produce a digital "tack" on a map corresponding with those coordinates. *Id.* at 1108. Though a person enters the coordinates, that person "has no role in figuring out where the tack will be placed" and Google Earth places the tack after analyzing the coordinates "without any human intervention." *Id.* at 1110. The Ninth Circuit concluded that because the program makes the relevant assertion that its tack aligns with the coordinates provided, there is no "statement" for hearsay purposes. *Id.* Several other circuit courts have reached similar conclusions. *See, e.g.*, *United States v. Waguespack*, 935 F.3d 322, 334 (5th Cir. 2019) (rejecting appellant's argument that the trial court erred by admitting machine-generated materials); *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018) (explaining that records "produced by machines" fell "outside the purview of Rule 801, as the declarant is not a person"); *United States v. Lamons*, 532 F.3d 1251, 1262–64 (11th Cir. 2008) (noting the court had "no difficulty" concluding that billing records from a telephone provider fell outside the definition of hearsay because producing those records was "fully automated" and "no human intervened at the time the raw billing data was 'stated' by the machine"); *United States v. Washington*, 498 F.3d 225, 229–31 (4th Cir. 2007) (finding that machine-generated raw data about a blood sample was not hearsay because "[o]nly a *person* may be a declarant and make a statement," meaning nothing produced by a machine constitutes hearsay).

¶21     The criminal intelligence analyst testified that Cellebrite automatically organizes the information it extracts. Aside from physically plugging the phone and SIM card into the hardware, there is no human input into the program's functioning or the report it produces. Importantly, the analyst explained that he cannot manipulate the information that Cellebrite generates in its report. *See People v. Hamilton*, 452 P.3d 184, 193, ¶ 26 (Colo. App. 2019) ("A computer-generated record constitutes hearsay, however, when its creation involves human input or interpretation."). Much like the program described in *Lizarraga-Tirado*, Cellebrite performs the "real work" of extracting data from the phone and does so "without any human intervention" after the phone is plugged into the system. *Lizarraga-Tirado*, 789 F.3d at 1110.

¶22     This is not to say that information or communications generated by computers or machines are automatically beyond the purview of hearsay. Machine-generated materials and reports may implicate

hearsay concerns when the underlying contents rely on some kind of human input to create those materials. *See United States v. Juhic*, 954 F.3d 1084, 1089 (8th Cir. 2020) (noting that an automated log of child sexual abuse material was hearsay because the process for compiling those materials required humans to tag those images); *see also Black v. State,* 358 S.W.3d 823, 832 (Tex. Crim. App. 2012) (finding that text messages stored on a cellphone were not computer-generated data exempt from hearsay because "the contents of the messages were produced by human thought and action"); *Baker v. State*, 117 A.3d 676, 683 (Md. Ct. Spec. App. 2015) (declining to find cellphone call records fell outside the definition of hearsay because the record showed the relevant data was "entered by a person"). Aside from hearsay, such materials may involve authentication issues. *See* Ariz. R. Evid. 901(a); *Lizarraga-Tirado*, 789 F.3d at 1110 ("A proponent must show that a machine is reliable and correctly calibrated, and that the data put into the machine is accurate."); *see also* Kenneth S. Broun et. al., 2 *McCormick on Evidence* § 294 (Robert P. Mosteller ed., 9th ed. 2025) ("Because such records are not the counterpart of a statement by a human declarant, which should ideally be tested by cross-examination of that declarant, they should not be treated as hearsay, but rather their admissibility should be determined on the basis of the reliability and accuracy of the process involved."). Those concerns are not presented here.

**¶23** Because Cellebrite is not a "person," and nothing in this record suggests the results of the Cellebrite report were in any way the product of human thought or action, they are not "statements" made by a "declarant," and thus are not hearsay under Evidence Rule 801. This conclusion aligns with decisions from other states addressing similar issues. *See e.g.*, *Bryan v. State*, 903 S.E.2d 160, 167–68 (Ga. App. 2024) (finding that Cellebrite extraction report was not a statement made by a declarant and therefore not hearsay); *Commonwealth v. Udeba*, 170 N.E.3d 709, 717 (Mass. App. Ct. 2021) (explaining that "the human input required to create the extraction reports essentially amounted to plugging each cell phone into the Cellebrite device" and that the extraction reports were "not statements for purposes of the hearsay rule"); *People v. Abad*, 490 P.3d 1094, 1105, ¶¶ 54–55 (Colo. App. 2021) (noting that cell phone extraction reports did "not require any human input short of plugging the phone into a machine" and because the reports were "automatically generated" they were not "statements" made by a "declarant"); *cf. Commonwealth v. Grubbs*, 330 A.3d 444, 451 (Pa. Super. Ct. 2025) (finding that GPS data collected from cell phone records did not qualify as hearsay).

¶24        Accordingly, we need not determine whether the exhibits met the requirements of a hearsay exception.  The trial court did not abuse its discretion by overruling Tapia-Munoz's objection.

## C.        Sentencing and Aggravating Factors

¶25        Tapia-Munoz's final argument concerns his sentences for aggravated assault and unlawful flight.  Because he failed to object at sentencing, we review for fundamental error only, which requires him to show his sentences were erroneous, the errors were fundamental, and the errors prejudiced him.  *Escalante*, 245 Ariz. at 142, ¶ 21.

¶26        The trial court found that Tapia-Munoz is a category three repetitive offender, a finding he did not challenge at sentencing or in his appellate briefing.  Thus, A.R.S. § 13-703(J) provides the relevant sentencing ranges for the offenses at issue.  To impose a maximum sentence, the court must have found at least one statutory aggravating factor under A.R.S. § 13-701(D).  *See* A.R.S. § 13-703(C).

### 1.        Aggravated Assault

¶27        Tapia-Munoz argues the trial court erred in sentencing him as to his aggravated assault conviction.  For all convictions except unlawful flight, the jury found two aggravating factors: Tapia-Munoz committed the offenses (1) with a deadly weapon or dangerous instrument; and (2) while he was lying in wait for the victim.  As to aggravated assault, Tapia-Munoz argues the first factor should not have been considered because the use of a deadly weapon or dangerous instrument was an essential element of the underlying aggravated assault conviction.

¶28        The State charged Tapia-Munoz with aggravated assault under A.R.S. § 13-1204(A)(2), which provides that a defendant commits aggravated assault by committing simple assault, *see* A.R.S. § 13-1203, and does so using "a deadly weapon or dangerous instrument," A.R.S. § 13-1204(A)(2).  Aggravated assault under this subsection is a class three felony.  A.R.S. § 13-1204(F).  Under A.R.S. § 13-703(J), the presumptive sentence term for a class three felony is 11.25 years and the maximum is 20 years.  Tapia-Munoz received a 20-year sentence for aggravated assault.

¶29        As provided in A.R.S. § 13-701(D)(2), the court may consider the use of a deadly weapon or dangerous instrument as an aggravating factor unless "this circumstance is an essential element of the offense of conviction."  Because the use of a deadly weapon or dangerous instrument

is an essential element of § 13-1204(A)(2), the court erred in considering this factor when imposing an aggravated sentence as to this conviction.

¶30 But Tapia-Munoz must also demonstrate fundamental error resulting in prejudice. *See Escalante*, 245 Ariz. at 142, ¶ 21. Although the imposition of an illegal sentence is fundamental error, *see State v. Munninger*, 213 Ariz. 393, 397, ¶ 11 (App. 2006), Tapia-Munoz did not receive an illegal sentence. The court needed only one proper aggravating factor to impose a sentence above the presumptive. *See* A.R.S. § 13-703(D); *State v. Martinez*, 210 Ariz. 578, 585, ¶ 26 (2005) ("[T]he existence of a single aggravating factor exposes a defendant to an aggravated sentence"). And the jury found such a factor by determining that Tapia-Munoz was lying in wait for the victim when he committed the offense. *See* A.R.S. § 13-701(D)(17). Moreover, the court found that Tapia-Munoz had prior convictions, which could also function as an aggravating factor. *See* A.R.S. § 13-701(D)(11). Because the court had sufficient aggravating factors to impose an aggravated sentence, Tapia-Munoz has not shown that resentencing is necessary.

## 2. Unlawful Flight

¶31 Tapia-Munoz likewise argues the court erred by imposing an aggravated sentence on his conviction for unlawful flight. Unlike Tapia-Munoz's other convictions, the jury found no aggravating factors applicable to this offense. Thus, he contends the court "improperly considered aggravating factors not found by the jury when it imposed an aggravated sentence." *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

¶32 Unlawful flight is a class five felony. A.R.S. § 28-622.01. Because the court found that Tapia-Munoz was a category three repetitive offender, his sentence for this offense is governed by A.R.S. § 13-703(J). Under A.R.S. § 13-703(J), the presumptive sentence for a class five felony is five years and the maximum, requiring at least one proper aggravating circumstance, is six years. *Id.*; A.R.S. § 13-701(C). The minimum sentence is four years. A.R.S. § 13-703(J). The court imposed a six-year sentence based on the aggravating factors the jury found, but as the State acknowledges, the jury found no aggravating factors for this offense.

¶33 The State argues nonetheless that Tapia-Munoz's sentence was appropriate because Tapia-Munoz committed the crime while on

pretrial release. Under A.R.S. § 13-708(D), "[a] person who is convicted of committing any felony offense that is committed while the person is released on bond or on the person's own recognizance on a separate felony offense . . . shall be sentenced to a term of imprisonment two years longer than would otherwise be imposed for the felony offense." At sentencing, the court found that Tapia-Munoz committed unlawful flight while on pretrial release for a separate felony offense.[2] In light of § 13-708(D), had the court imposed the presumptive term for this offense, for which no aggravating factor is required, Tapia-Munoz would have received a seven-year sentence. But the six-year sentence the court imposed meant that Tapia-Munoz actually received the *minimum* sentence (four years) for unlawful flight. With the two-year enhancement required under § 13-708(D), the court did not err because no aggravating factors were needed to support a six-year sentence for unlawful flight.

## CONCLUSION

¶34        We affirm Tapia-Munoz's convictions and sentences.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:              JR

---

[2]        The State notes in its answering brief the trial court found Tapia-Munoz committed the crime while on pretrial release. Because that finding increased his sentence through § 13-708(D), such a finding should have been made by a jury. *See State v. Gross*, 201 Ariz. 41, 45, ¶ 19 (App. 2001) (concluding that a defendant's release status, for sentencing purposes, must be determined by a jury); *State v. Benenati*, 203 Ariz. 235, 241–42, ¶ 22 (App. 2002) (vacating two-year sentencing enhancement because consideration of defendant's release status was not decided by the jury). But Tapia-Munoz did not object to the court's finding, nor has he challenged it on appeal. Thus, we consider the implication of § 13-708(D) for his sentence but note that in normal circumstances such a finding is appropriately left to the jury rather than the court.